# SPRING VALLEY WATER WORKS *v.* SCHOTTLER & Others, Supervisors.

IN ERROR TO THE SUPREME COURT OF CALIFORNIA.

Argued November 20th, 21st, 1883.—Decided February 4th, 1884.

*Constitutional Law—Corporations.*

Laws requiring gas companies, water companies and other corporations of like character to supply their customers at prices fixed by the municipal authorities of the locality, are within the scope of legislative power unless prohibited by constitutional limitation or valid contract obligation.

The Constitution of a State provided that corporations might be formed under general laws, and should not be created by special act, except for munic-

ipal purposes, and that all laws, general and special, passed pursuant to that provision might be from time to time altered and repealed. A general law was enacted by the legislature for the formation of corporations for supplying cities, counties and towns with water, which provided that the rates to be charged for water should be fixed by a board of commissioners to be appointed in part by the corporations and in part by municipal authorities. The Constitution and laws of the State were subsequently changed so as to take away from corporations which had been organized and put into operation under the old Constitution and laws the power to name members of the boards of commissioners, and so as to place in municipal authorities the sole power of fixing rates for water : *Held,* That these changes violated no provision of the Constitution of the United States.

The plaintiffs in error were petitioners in the courts of California for a writ of mandamus against the defendants in error. The constitutional question at issue was the right of the State of California to alter the plaintiff's charter. The facts making the case to raise this question are stated in the opinion of the court.

*Mr. Charles N. Fox* for plaintiff in error.

*Mr. Francis G. Newlands* for same.

*Mr. A. L. Rhodes* for defendants in error.

*Mr. George F. Edmunds* for plaintiff in error.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

Art. IV., sec. 31, of the Constitution of California adopted in 1849 is as follows :

" Corporations may be formed under general laws, but shall not be created by special act except for municipal purposes. All general laws and special acts passed pursuant to this section may be altered from time to time, or repealed."

Acts were passed by the legislature under this authority on the 14th of April, 1853, and the 30th of April, 1855, providing for the formation of corporations for certain purposes, and on the 22d of April, 1858, these acts were extended so as to include the formation of corporations for the purpose of supplying cities, counties, and towns with water. Under this exten-

sion water companies were empowered to acquire lands and waters for their works by purchase and condemnation, and, subject to the reasonable direction of the public authorities, to use streets, ways, alleys, and public roads for laying their pipes; but it was expressly provided, by an amendment enacted in 1861—

"That all canals, reservoirs, ditches, pipes, aqueducts, and all conduits . . . shall be used exclusively for the purpose of supplying any city or county, or any cities or towns, in this State, or the inhabitants thereof, with pure, fresh water."

Sec. 4 is as follows :

"Sec. 4. All corporations formed under the provisions of this act, or claiming any of the privileges of the same, shall furnish pure, fresh water to the inhabitants of such city and county, or city or town, for family uses, so long as the supply permits, at reasonable rates, and without distinction of persons, upon proper demand therefor, and shall furnish water, to the extent of their means, to such city and county, or city or town, in case of fire or other great necessity, free of charge. And the rates to be charged for water shall be determined by a board of commissioners, to be selected as follows : Two by such city and county, or city or town authorities, and two by the water company ; and in case that four cannot agree to the valuation, then, in that case, the four shall choose a fifth person, and he shall become a member of said board ; if the four commissioners cannot agree upon a fifth, then the sheriff of the county shall appoint such fifth person. The decision of a majority of said board shall determine the rates to be charged for water for one year, and until new rates shall be established. The board of supervisors, or the proper city or town authorities, may prescribe such other proper rules relating to the delivery of water, not inconsistent with this act and the laws and Constitution of this State."

The Spring Valley Water Works Company was formed under this act on the 19th of June, 1858, and since that time has expended a very large amount of money in the erection of extensive and substantial works for the supply of the city and

county of San Francisco with water. In January, 1878, the board of supervisors of the city and county appointed Isaac B. Friedlander and H. B. Williams, and the company appointed W. F. Babcock and Charles Webb Howard, and these four afterwards appointed Jerome Lincoln, to constitute a board of commissioners to determine, under the provisions of section 4, the rates to be charged by the company for water. This board met and fixed the tariff of rates to go into effect on the 1st of June, 1878. In July, of the same year, Friedlander, one of the commissioners appointed by the supervisors, died. By his death a vacancy was created in the board which has never been filled.

In 1879 the people of California adopted a new Constitution, which went into effect on the 1st of January, 1880. Art. XIV., §§ 1 and 2 of this Constitution are as follows:

## "ARTICLE XIV.

### "Water and Water Rights.

"SECTION 1. The uses of all water now appropriated, or that may hereafter be appropriated, for sale, rental, or distribution, is hereby declared to be a public use, and subject to the regulation and control of the State, in the manner to be prescribed by law : Provided, that the rates or compensation to be collected by any person, company, or corporation in this State for the use of water supplied to any city and county, or city or town, or the inhabitants thereof, shall be fixed, annually, by the board of supervisors, or city and county, or city or town council, or other governing body of such city and county, or city or town, by ordinance or otherwise, in the manner that other ordinances or legislative acts or resolutions are passed by such body, and shall continue in force for one year and no longer. Such ordinances or resolutions shall be passed in the month of February of each year, and take effect on the first day of July thereafter. Any board or body failing to pass the necessary ordinances or resolutions fixing water rates, where necessary, within such time, shall be subject to peremptory process to compel action at the suit of any party interested, and shall be liable to such further processes and penalties as the legislature may prescribe. Any person, company, or corporation collecting water rates in any city and county, or city or town in this

State, otherwise than as so established, shall forfeit the franchises and water works, of such person, company, or corporation to the city and county, or city or town, where the same are collected, for the public use.

"Sec. 2. The right to collect rates or compensation for the use of water supplied to any county, city and county, or town, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law."

Under this provision of the Constitution and the legislation based thereon, the board of supervisors claim the right and power to fix the rates to be charged by the company for water, and refuse to appoint a member to fill the vacancy in the board of commissioners occasioned by the death of the former incumbent. This suit was begun in the Supreme Court of the State for a writ of mandamus requiring the board of supervisors to take action in the matter and fill the vacancy. The court on final hearing refused the writ and dismissed the petition. This writ of error was brought by the company to review that judgment.

The general question involved in this case is whether water companies in California, formed under the act of 1858 before the adoption of the Constitution of 1879, have a right, which the State is prohibited by the Constitution of the United States from impairing or taking away, to charge their customers such prices for water as may from time to time be fixed by a commission made up of two persons selected by the company, two by the public authorities of the locality, and, if need be, a fifth selected by the other four, or by the sheriff of the county. The Spring Valley Company claims no rights of this character that may not also be claimed by every other company formed under the same act.

That the companies must sell at reasonable prices all the water they are able to furnish consumers, and that the prices fixed for the time being by the honest judgment of such a commission as was specially provided for in the act, must be deemed reasonable, both by the company and the public, is not denied. The dispute is as to the power of the State, under the prohibitions of

the Constitution of the United States, to substitute for this commission another, selected without the co-operation of the company, or some other tribunal of a different character, like the municipal authorities of the locality. The Spring Valley Company claims that it has, under its charter, a right to the maintenance of the commission which was created by the requisite appointments in 1878, and the object of this suit is to compel the board of supervisors to perpetuate that commission by filling the vacancy that exists in its membership. So that the whole controversy here is as to the right of water companies that availed themselves of the privileges of the act of 1858 to secure a virtual monopoly of trade in water at a particular place, to demand the appointment of the commission provided for in that act, notwithstanding the Constitution of 1879 and the legislation under it.

The Spring Valley Company is an artificial being created by or under the authority of the legislature of California. The people of the State, when they first established their government, provided in express terms that corporations, other than for municipal purposes, should not be formed except under general laws, subject at all times to alteration or repeal. The reservation of power to alter or repeal the charters of corporations was not new, for almost immediately after the judgment of this court in the Dartmouth College Case (*Dartmouth College* v. *Woodward*, 4 Wheat. 518), the States, many of them, in granting charters acted on the suggestion of Mr. Justice Story in his concurring opinion (p. 712), and inserted provisions by which such authority was expressly retained. Even before this decision it was intimated by the Supreme Judicial Court of Massachusetts in *Wales* v. *Stetson*, 2 Mass. 143, that such a reservation would save to the State its power of control. In California the Constitution put this reservation into every charter, and consequently this company was from the moment of its creation subject to the legislative power of alteration, and, if deemed expedient, of absolute extinguishment as a corporate body.

Water for domestic uses was difficult to be got in some parts of the State. Large amounts of money were needed to secure

a sufficient supply for the inhabitants in many localities, and as a means of combining capital for such purposes the act of 1858 was passed. Other statutes had been enacted before to effect the same object, but it is said they were not such as a company with capital enough to supply San Francisco was willing to accept. The act of 1858 was thought sufficiently favorable, and the Spring Valley Company, after organizing under it, expended a large amount of money to provide the means of supplying the territory on which San Francisco is built, and make it possible to support a great population there. All this was done in the face of the limitations of the Constitution on the power of the legislature to create a private corporation and put it beyond the reach of legislative control, not only as to its continued existence, but as to its privileges and franchises. One of the obligations the company assumed was to sell water at reasonable prices, and the law provided for a special commission to determine what should be deemed reasonable both by the consumers and the company, but there is nowhere to be found any evidence of even a willingness to contract away the power of the legislature to prescribe another mode of settling the same question if it should be considered desirable. In the *Sinking Fund Cases,* 99 U. S. 700, it was said that whatever rules for the government of the affairs of a corporation might have been put into the charter when granted could afterwards be established by the legislature under its reserved power of amendment. Long before the Constitution of 1879 was adopted in California, statutes had been passed in many of the States requiring water companies, gas companies, and other companies of like character to supply their customers at prices to be fixed by the municipal authorities of the locality ; and, as an independent proposition, we see no reason why such a regulation is not within the scope of legislative power, unless prohibited by constitutional limitations or valid contract obligations. Whether expedient or not is a question for the legislature, not the courts.

It is said, however, that appointing municipal officers to fix prices between the seller and the buyers is in effect appointing the buyers themselves, since the buyers elect the officers, and

that this is a violation of the principle that no man shall be a judge in his own case. But the officers here selected are the governing board of the municipality, and they are to act in their official capacity as such a board when performing the duty which has been imposed upon them. Their general duty is, within the limit of their powers, to administer the local government, and in so doing to provide that all shall so conduct themselves, and so use their own property, as not unnecessarily to injure others. They are elected by the people for that purpose, and whatever is within the just scope of the purpose may properly be entrusted to them at the discretion of the legislature. That it is within the power of the government to regulate the prices at which water shall be sold by one who enjoys a virtual monopoly of the sale, we do not doubt. That question is settled by what was decided on full consideration in *Munn* v. *Illinois*, 94 U. S. 113. As was said in that case, such regulations do not deprive a person of his property without due process of law. What may be done if the municipal authorities do not exercise an honest judgment, or if they fix upon a price which is manifestly unreasonable, need not now be considered, for that proposition is not presented by this record. The objection here is not to any improper prices fixed by the officers, but to their power to fix prices at all. By the Constitution and the legislation under it, the municipal authorities have been created a special tribunal to determine what, as between the public and the company, shall be deemed a reasonable price during a certain limited period. Like every other tribunal established by the legislature for such a purpose, their duties are judicial in their nature, and they are bound in morals and in law to exercise an honest judgment as to all matters submitted for their official determination. It is not to be presumed that they will act otherwise than according to this rule. And here again it is to be kept in mind that the question before us is not as to the penalties to be inflicted on the company for a failure to sell at the prices fixed, but as to the power to fix the price; not whether the company shall forfeit its property and franchises to the city and county if it fails to meet the requirements of the Constitution, but whether the prices it shall

charge may be established in the way provided for in that instrument. It will be time enough to consider the consequences of the omissions of the company when a case involving such questions shall be presented.

But it is argued that as the laws in force before 1858, for the formation of water companies, which provided for fixing the rates by the municipal authorities, were not accepted by the Spring Valley Company, and that of 1858, without such a provision, was, it is to be inferred that the State contracted with this company not to subject it to the judgment of such authorities in a matter so vital to its interests. If the question were one of construction only, this argument might have force, but the dispute now is as to legislative power, not legislative action. The Constitution of California adopted in 1849 prohibited one legislature from bargaining away the power of succeeding legislatures to control the administration of the affairs of a private corporation formed under the laws of the State. Of this legislative disability the Spring Valley Company had notice when it accepted the privileges of the act of 1858, and it must be presumed to have built its works and expended its moneys in the hope that neither a succeeding legislature, nor the people in their collective capacity when framing a Constitution, would ever deem it expedient to return to the old mode of fixing rates, rather than on any want of power to do so, if found desirable. The question here is not between the buyer and the seller as to prices, but between the State and one of its corporations as to what corporate privileges have been granted. The power to amend corporate charters is no doubt one that bad men may abuse, but when the amendments are within the scope of the power, the courts cannot interfere with the discretion of the legislatures that have been invested with authority to make them.

The organization of the Spring Valley Company was not a business arrangement between the State and the company as contracting parties, but the creation of a new corporation to do business within the State and to be governed as natural persons or other corporations were or might be. Neither are the chartered rights acquired by the company under the law to be

looked upon as contracts with the city and county of San Francisco. The corporation was created by the State. All its powers came from the State and none from the city or county. As a corporation it can contract with the city and county in any way allowed by law, but its powers and obligations, except those which grow out of contracts lawfully made, depend alone on the statute under which it was organized, and such alterations and amendments thereof as may, from time to time, be made by proper authority. The provision for fixing rates cannot be separated from the remainder of the statute by calling it a contract. It was a condition attached to the franchises conferred on any corporation formed under the statute and indissolubly connected with the reserved power of alteration and repeal.

It follows that the court below was right in refusing to award the writ of mandamus which was prayed, and its judgment to that effect is

*Affirmed.*

Mr. Justice Field, dissenting.

I am not able to concur with the court in its decision, nor can I assent to the reasons assigned for it. It seems to me that it goes beyond all former adjudications in sanctioning legislation impairing the obligation of contracts made by a State with corporations. It declares, in effect, that whenever a corporation is created with the reservation that the legislature may alter or repeal its charter, or under a law or Constitution which imposes such a reservation of power, no contract can be made between it and the State, which shall bind the State any longer than she may choose to be bound; that she may provide that certain rights shall be secured, or that certain payments shall be made in consideration of work to be performed or capital to be advanced by a corporation created under her laws; and when the work is done and the capital is expended, she may legally, constitutionally, repudiate her pledges. In other words, the decision seems to me to sanction the doctrine, that a contract between a State and a corporation, created with the reservation mentioned, is binding only

upon the corporation. I shall endeavor to show that this doctrine is unsound, believing that in this case, and in all others where it is asserted, it will work injustice.

By a general law of California, passed April 14th, 1853, provision was made for the formation of corporations for manufacturing, mining, mechanical, and chemical purposes, or for the purpose of engaging *in any species of trade or commerce*, foreign or domestic. It enacted that three or more persons, who desired to form a company for any of the purposes mentioned, should make, sign, and acknowledge, before some officer competent to take the acknowledgments of deeds, a certificate stating the corporate name of the company, the objects of its formation, the amount of its capital stock, the time of its existence, which could not exceed fifty years, the number of shares of which the stock was to consist, the number of trustees and their names, who should manage the concerns of the company for the first three months, and the name of the city, or town, or county in which the principal place of business of the company was to be located, and file the certificate in the office of the clerk of the county in which such principal place of business was located, and a certified copy thereof, under the hand of the clerk and seal of the County Court, in the office of the Secretary of State; and that upon filing such certificate, the persons signing and acknowledging it, and their successors, should be a body politic and corporate by the name stated in the certificate, and have succession for the period limited, and also such powers as are usually conferred upon corporate bodies.

Under this act, and an amendatory act of 1855, corporations were formed for the purpose of supplying the inhabitants of the city and county of San Francisco with pure, fresh water. Doubts were however expressed in some quarters whether supplying the water was engaging *in any species of trade or commerce* within the meaning of those acts. *Heyneman* v. *Blake*, 19 Cal. 579. Accordingly, on the 22d of April, 1858, a general law was passed for the incorporation of water companies, which referred to the provisions of the act of 1853, and of the amendatory act of 1855; and declared that they should apply

to all corporations, already formed or that might afterwards be formed *under said acts*, for the purpose of supplying any city and county, or any cities or towns, in the State, or the inhabitants thereof, with pure, fresh water.   On the following day, April 23d, 1858, another act-was passed, which author- ized George H. Ensign and other owners of the Spring Valley Water Works to lay down water pipes in the public streets of the city and county of San Francisco.   On the 19th of June, 1858, the plaintiff was organized as a corporation, referring in its certificate to these last two acts; but as the special act relating to Ensign and others was subsequently declared un- constitutional by the Supreme Court of the State, the incor- poration of the plaintiff rests upon the act of April 22d, 1858, or rather upon the acts of 1854 and of 1855, to which it refers. This act of 1858 gave the corporation thus formed the right to purchase or to appropriate and take possession of, and use and hold all such lands and waters as might be required for the purposes of the company, upon making compensation there- for ; with a proviso, however, that all reservoirs, canals, ditches, pipes, aqueducts, and conduits constructed by the corporation, should be used exclusively for the purpose of supplying the city and county and the inhabitants thereof with pure, fresh water.

Having provided for the incorporation of the company, the act of 1858 proceeded to prescribe the terms upon which water should be supplied to the city and county, and to their inhabit- ants, and the compensation which the company should receive therefor.   It declared that the company should furnish pure, fresh water to the inhabitants for family uses, so long as the supply permitted, at reasonable rates, and without distinction of persons, upon proper demand therefor, and should furnish water, to the extent of its means, to the city and county; "in case of fire or other great necessity, free of charge."   The act further declared that the rates to be charged for water should be determined by a board of commissioners, to be selected as follows: two by the city and county authorities, and two by the water company; and in case the four could not agree to the valuation, then, in that case, the four should choose a fifth.

person, and he should become a member of the board; and if the four commissioners could not agree upon a fifth, then the sheriff of the county should appoint him; and that the decision of a majority of the board should determine the rates to be charged for water for one year, and until new rates should be established.   The act also declared that the board of supervisors might prescribe such other proper rules relating to the delivery of water, not inconsistent with the act and the laws and Constitution of the State; and that the corporation should have the right, subject to the reasonable direction of the city authorities as to the mode and manner of exercising it, to use so much of the streets, ways, and alleys of the city and county, or of the public road therein, as might be necessary for laying its pipes for conducting water into the city or county, or through any part thereof.

·The certificate of incorporation of the plaintiff declared that the objects for which the company was formed were to introduce pure, fresh water into the city and county of San Francisco, and into any part thereof, from any point or place, for the purpose of supplying the inhabitants of the city and county with the same, and to do and transact all such business relating thereto as might be necessary and proper, not inconsistent with the laws and Constitution of the State.

The necessary supply of water could not be obtained from any natural streams or lakes on the peninsula, upon the upper end of which the city and county are situated.   A small lake near the city furnished an insufficient supply and of inferior quality.   The company, therefore, soon after its incorporation, undertook to collect the required quantity in artificial reservoirs, as it descended in rain from the heavens.

At a distance of about twenty miles from the city, there is a natural ravine lying between the mountains near the ocean and the hills bordering the Bay of San Francisco.   The company acquired the lands within this ravine and on its sides, amounting, as represented by counsel, to eighteen thousand acres, and erected in it heavy walls at long distances apart, thus making great reservoirs, into which the water was collected until lakes were formed extending several miles in length.

With aqueducts, pipes, and other conduits the water thus collected was carried to the city and distributed in mains. It is said that the cost of these works to the company amounted to nearly fifteen millions of dollars. Before their construction and the introduction of this water, the inhabitants of the city were poorly and inadequately supplied. With the completion of the works of the plaintiff all this was changed. Water was furnished to all persons calling for it at their houses, and if desired in every room; and to the city in abundance for all its needs.

The law of 1858, as stated, required the corporation to furnish water, to the extent of its means, to the city and county, "in case of fire or other great necessity, free of charge." This provision had been construed by the Supreme Court of the State to require the company also to furnish, without charge, water to sprinkle the streets of the city, to flush its sewers, and to irrigate its public squares and parks. Its effects will be only partially appreciated by those who judge merely from the size of the city, and the fact that the residences are chiefly constructed of wood. There are other uses for a much larger supply of water. The city is situated at the upper end of a peninsula whose width is only a little over six miles. The land there consists principally of a succession of sand hills, and the daily breezes of the ocean keep the sand in almost constant motion, except where vegetation has fixed its roots. For this vegetation water is essential. With it, every plant will thrive, even in the sand, and shrubs and trees will grow in great luxuriance. The absence of water from them for even a few months will cause the plants and shrubs to droop, wither, and perish. The public squares of the city are numerous, and the park—termed the "Golden Gate Park," because it is near the entrance of the bay which is termed the "Golden Gate" —covers more than a mile square of these sand hills. On these squares and this park, the constant use of water from the reservoirs of the plaintiff is necessary to keep the grasses, plants, and shrubs alive. Yet all water needed for these purposes is, by the law in question, to be furnished without charge. That was one of the burdens imposed upon the plaintiff, in

addition to the requirement that its costly works, consisting of aqueducts extending nearly thirty miles out of the city, and mains within it exceeding one hundred miles, should be used exclusively for the purpose of supplying the city and county with water. The reasonable rates allowed for the water furnished to the inhabitants of the city and county constituted the only compensation of the company for the enormous outlay to which it was necessarily subjected, and for all the benefits it undertook to confer. The law in declaring that a company formed under it should supply water to the city and county in cases of great necessity free of charge, and to their inhabitants on demand at reasonable rates, in effect declared that the company complying with such terms should receive those rates for water thus supplied to the inhabitants. When, therefore, the plaintiff organized under the law introduced the water, a contract was completed between it on the one part and the State on the other, that so long as it existed and furnished the water as required it should receive this compensation. The provision for the creation of an impartial tribunal to determine each year what rates should be deemed reasonable, was the very life of the stipulation for a reasonable compensation. It would not have done to leave the compensation to be fixed by the company alone, as it might thus make its charges exorbitant; it would not have done to leave the rate to be fixed by the city authorities alone, as they would be constantly under a great pressure to reduce the rates below remunerative prices, as the representatives of the city, itself a large consumer for public buildings, and as representatives of individual consumers, by whom they were elected and to whom they were to look for the approval of their acts, and because the individuals composing those authorities would also be consumers of the water equally with their constituents. It was, therefore, provided that the rates should be fixed by commissioners, to be selected as stated above.

It would be difficult to conceive of a tribunal fairer in its organization, or more likely to act justly and wisely for both parties, and guard equally against extortion in prices on the one hand and their unjust reduction on the other. Such a

tribunal was formed and, from time to time, reasonable rates for water were established by it.    But in 1879 the people of California formed a new Constitution, which declared that the use of all water then appropriated, or that might thereafter be appropriated, for sale, rental, or distribution, was a public use, and subject to the regulation and control of the State in the manner to be prescribed by law; that the rates or compensation to be collected by any person, company, or corporation for the use of water supplied to any city and county, or to its inhabitants, should be fixed, annually by the board of supervisors of the city and county, or other governing body of the same, by ordinance or otherwise, in the manner that other ordinances or legislative acts or resolutions are passed by such body, and should continue in force for one year and no longer; that such ordinances or resolutions should be passed in the month of February of each year, and take effect on the first day of July thereafter.    And it further declared that any board or body failing to pass the necessary ordinances or resolutions fixing water rates, when necessary, within such time, should be subject to peremptory process to compel action at the suit of any party interested, and should be liable to such further processes and penalties as the legislature might prescribe; and that any person, company, or corporation collecting water rates in any city and county, otherwise than as so established, should forfeit its franchises and water works to the city and county where the same are collected, for public use.   (Art. XIV., sec. 1.)

In July, 1878, a vacancy occurred in the board of commissioners, which the city authorities, after the adoption of the new Constitution, refused to fill, contending that, under its provisions, they were authorized to fix the water rates.    The present proceeding was to compel them to proceed and complete the board; and the question is whether that Constitution, in vesting the entire power in the board of supervisors—the governing authority of the city and county of San Francisco— impairs the contract between the State and the company, within the prohibition of the federal Constitution.    There is no question of the continuance of a virtual monopoly in water,

as supposed by the court.   There is nothing relating to a monopoly in the case.   Any five or more persons in California can, at any time, form themselves into a corporation to bring water into the city and county of San Francisco on the same terms with the plaintiff; and such new corporation can, in the same way, form reservoirs in the ravines in the hills and collect water for sale, or bring water from the mountain lakes.   Until within a few years any three or more persons could form such a corporation.   The statement that the plaintiff has a monopoly of any kind in water, and desires to secure forever certain charges, must therefore be taken as one inadvertently made, without due consideration of the facts.   The only contention in the case is, whether the clause of the new Constitution abrogating the stipulation for reasonable rates to be established by a commission created as mentioned, is a valid exercise of power by the State.

That the provision of the law of 1858, making that stipulation, was a part of the contract between the State and the company, is not denied by the court; nor is it denied that it was also a part of the contract that the "reasonable rates" should be determined by the commissioners designated.   But the position taken, if I understand it, is, that the provision for their appointment is only that the rates shall be established by an impartial tribunal, not necessarily by one created as there prescribed; and that the State has a right to determine what tribunal shall be deemed an impartial one; and, by the fourteenth article of the new Constitution, has done so and made the board of supervisors that tribunal; and that this action was within the power reserved by the original act of incorporation.

Of course this view destroys all the substance and value of the stipulation for reasonable rates and renders it utterly delusive.   The very object of the creation of the tribunal designated in the law of 1858 was to take the establishment of the rates from the city authorities, who, it was believed then, as it is known now, would be influenced and controlled by their relation as representatives of the consumers by whom they are elected, as well as by the fact that the individual members

composing those authorities would be themselves consumers. Admitting for the argument that the meaning of the provision is only that the company shall have an impartial tribunal, and not necessarily the one created as designated, it seems to me to be plain that such new tribunal cannot consist of the city authorities, against whose exclusive control the original contract expressly stipulated. Placing the regulation of rates with them is not furnishing another tribunal equally impartial with the one mentioned. From the very nature of its creation and its relation to others, the board of supervisors, an elective body, cannot be impartial. No tribunal, however honorable and high the character of the persons composing it may be, is, or can be, in a legal sense, impartial, when they are individually interested, and the tribunal itself, in its representative character, is interested in the determination to be made.

It need hardly be said that it is an elementary principle of natural justice that no man shall sit in judgment where he is interested, no matter how unimpeachable his personal integrity. The principle is not limited to cases arising in the ordinary courts of law in the regular administration of justice, but extends to all cases where a tribunal of any kind is established to decide upon the rights of different parties.

In *City of London* v. *Wood*, 12 Modern, 669, it was held by the King's Bench that an action in the names of the mayor and commonalty of London could not be brought before the court held by the mayor and aldermen; for, said Chief Justice Holt, "it is against all laws that the same person should be party and judge in the same cause;" and to the objection that the Lord Mayor, as the head of the corporation, acted in his political capacity and judged in his natural capacity, he answered: "It is true he acts in different capacities, yet the person is the same, and the difference in the capacities in which he acts does not make a difference," which would remove the disqualification.

The true doctrine on this subject is stated with great clearness by the Supreme Court of Massachusetts in the recent cases of *Hall* v. *Thayer*, 105 Mass. 219, where it was held that the judge of probate was disqualified by personal interest

to appoint his wife's brother administrator of the estate of a deceased person of which her father was principal creditor. Referring to the provision of article 29 of the Declaration of Rights of that State, "that it is the right of every citizen to be tried by judges as fair, impartial and independent as the lot of humanity will admit," the court said:

"The provision rests upon a principle so obviously just and so necessary for the protection of the citizen against injustice that no argument is necessary to sustain it, but it must be accepted as an elementary truth. The impartiality which it requires incapacitates one to act as judge in a matter in which he has any pecuniary interest, or in which his near relative or connection is one of the parties. It applies to civil as well as criminal causes, and not only to judges of courts of common law and equity and probate, but to special tribunals and *to persons authorized on a special occasion to decide between parties in respect to their rights.*" [And, after referring to several decisions where the principle had been applied, the court said]: "These decisions show that the provision is to have no technical or strict construction, but it is to be broadly applied to all classes of cases where one is appointed to decide the rights of his fellow-citizens."

I admit that the interest which will disqualify a special tribunal from acting in a matter affecting conflicting rights of parties must be a direct pecuniary interest either in its members or in the persons represented by it, which may be increased or diminished by the determination reached. Such is the precise condition of the board of supervisors of the city and county of San Francisco with respect to the prices to be paid for the water furnished by the plaintiff. The consumers of the water constitute, with few exceptions where a well may have been sunk, the entire people of that district, including the supervisors themselves, and they are all, therefore, directly interested to reduce its price. If the board were to seek to acquire land whereon to open a new street, or to erect public buildings, no one would pretend that the compensation which it would be necessary to make to the owner, could be fixed by the board, or by appraisers whom it should appoint. It would

be on that subject an interested party, and, therefore, on the
principle already stated, could not act in the matter where the
rights of others were concerned.

The Supreme Court of Wisconsin held a provision of law
void which authorized the common council of a municipal cor-
poration to appoint jurors to assess damages to the owner of
property taken for public uses of the city, in the place of oth-
ers previously appointed for that purpose by a judge of the
Circuit or County Court, but who had neglected or refused to
serve.

"A majority," said the court, "or even all of the jurors selected
to establish the necessity of taking the property, may refuse to
act in fixing the amount of damages, in which case the common
council, one of the parties, *ex parte*, may appoint a jury which
shall determine the amount of damages the city must pay. It is
impossible to comment in a proper manner upon such a provision
which confounds all our notions of fairness, justice, and right."
*Lumsden* v. *Milwaukee City*, 8 Wis. 485, 494.

If instead of land the board should desire to acquire per-
sonal property—fuel for the public buildings of the city, paving
material for its streets, engines for its fire department, or any
other property for its needs—no one would pretend, independ-
ently of any law on the subject, that there would be any jus-
tice or fairness in allowing that body alone to determine the
price to be paid.

There will always be, as I have said, a great pressure upon
the board by the people electing it to regulate the price of the
water in their interest, without regard to that of the company.
The influence thus exerted to warp the judgment of the mem-
bers and change the character of the body from that of an
impartial tribunal to one acting in the interest of its constitu-
ents, every practical man dealing with the corporation would
appreciate and act upon. All the influences usually brought
to bear at elections to secure the choice of those who will carry
out the wishes of the voters, we should expect to see applied
to secure the election of candidates thus empowered to fix the
price of the article which the voters daily consume. And

what we might thus expect has occurred at every election since the new Constitution went into effect. A suit was recently brought by the plaintiff in the Circuit Court of the United States for the District of California against the mayor and supervisors of San Francisco to enjoin the passage of an ordinance, then proposed, to fix the price of its water under this new Constitution. Among other reasons urged upon the consideration of the court was the fact that the mayor and supervisors, before the election, had pledged themselves to make a material reduction in the rates, which, if carried out, the company contended would be destructive of its interests. The fact that such pledges were made was not controverted, but the court answered that

"If it be competent at all, under the provision in question, for the people of San Francisco through their representatives in the board of supervisors to pass the proposed ordinance, it is difficult to perceive why, in looking around for agents or representatives to carry out their will, it is unlawful to ask in advance whether those seeking to represent them will obey their command in these particulars, or to require a pledge to that effect before committing the trust to them."

And in the same case the court referred to the clause in the new Constitution declaring that any corporation collecting water rates in any city and county otherwise than as established by the board of supervisors of the district, should forfeit its franchises and water works to the city and county for the use of the public, and said:

"It would seem to be only necessary to make this brief statement of the case to enable one of ordinary intelligence, endowed with a reasonable share of moral sense, to perceive the monstrous injustice of thus placing the large investments of complainant, made under the stimulus of the inducement held out by the act of 1858, at the absolute mercy of an irresponsible public sentiment, or of public cupidity. This last provision would seem to offer a large premium for the perpetration of a wrong—a large inducement to the purchaser (the consumer) to fix the price at unremunerative rates, in order to secure the large property by for-

feiture and confiscation, or to so largely diminish its value as to force a sale to the city at a price far below its real value. It was alleged in the argument, and not denied, to be a matter of public history and public notoriety, of which we are authorized to take notice, that such designs have been openly and publicly avowed and advocated by public speakers."

It is difficult to understand how any just man, carefully considering what has been thus stated, can hold that the board constitutes an impartial tribunal such as the law of 1858 assured the plaintiff, as an inducement for its large expenditures, it should always have to determine what rates are reasonable. The great wrong and injustice done to the plaintiff by subjecting the determination of the rates it shall receive for its property to the judgment of a tribunal thus deeply interested against it, and impelled to reduce them by an exacting and constantly pressing constituency, are declared by the court to be justified by the law and Constitution of the State, and in no way forbidden by the contract clause of the federal Constitution which was designed to insure the observance of good faith in the stipulation of parties against State action. Authority to interfere with and destroy the contract rights of the plaintiff is claimed, as already stated, under the power reserved to the State by its Constitution, in force at the time, to alter or repeal the law pursuant to which the plaintiff was incorporated. Such authority is also asserted from the public interest which the State is alleged to have acquired in the use of the water furnished by the plaintiff.

Upon each of these grounds I have a few words to say. The clause of the State Constitution referred to in the first of them is in these words:

" Corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed."

It is contended that the right thus reserved to alter or repeal the general law, under which the plaintiff was incorporated,

authorized the State to exercise greater control over the business and property of the company than it could have exercised over like business and property of natural persons; that as the repeal of the general law would put an end to the corporation, the State could prescribe the conditions of its continued existence, and, therefore, could legitimately impose any restrictions and limitations, however burdensome, upon the subsequent possession and use of its property, and require the corporation to comply with them. Indeed, there seems to be an impression in the minds of counsel, and, from the language not infrequently used by some judges, in their minds also, that the reservation in charters of corporations and in laws authorizing the formation of corporations, of a power to alter or repeal such charters or laws, operates as a gift to the State and to the legislature of uncontrolled authority over the business and property of the corporations. And yet no doctrine is more unfounded in principle or less supported by authority. When carried out in practice, it is utterly destructive of all rights of property of corporate bodies. Those who entertain it overlook the occasion which led to the adoption of the clause containing the reservation, and the object it was designed to accomplish.

When this court, in the Dartmouth College case, decided that the charter of a private corporation was a contract between the State and the corporators, and therefore within the protection of the inhibition of the federal Constitution against impairment of contracts by State legislation, it was suggested by Judge Story, who concurred in the decision, that this unalterable and irrepealable character of the contract might be avoided by a reservation of power in the original charter.

" In my judgment," he said, " it is perfectly clear that any act of a legislature which takes away any powers or franchises vested by its charter in a private corporation or its corporate officers, or which restrains or controls the legitimate exercise of them, or transfers them to other persons without its assent, is a violation of the obligation of that charter. If the legislature mean to claim such an authority, it must be reserved in the grant. The charter of Dartmouth College contains no such reservation, and I

am, therefore, bound to declare that the acts of the legislature of New Hampshire now in question do impair the obligation of that charter, and are consequently unconstitutional and void." 4 Wheat. 712.

In another part of his opinion he refers to an early decision of the Supreme Court of Massachusetts, which had declared that the rights legally vested in a corporation could not be controlled or destroyed by a subsequent statute, "*unless a power for* that purpose be reserved to the *legislature in the act of incorporation.*" 4 Wheat. 708.

When the general character of the decision in the Dartmouth College case became known, the States acted very generally upon the suggestion of Judge Story, and few charters were subsequently granted without a clause reserving to the legislature the power to alter or repeal them. In some instances a general law was enacted, declaring that all corporations subsequently created should be subject to this reserved power; and in some cases, where a new Constitution was adopted by a State, a clause of similar import was inserted. The object of the reservation, in whatever form expressed, was to preserve to the State control over the corporate franchises, rights, and privileges which, in her sovereign or legislative capacity, she had called into existence; in other words, to enable her to annul or modify that which she had created. It was not its object to interfere with contracts which the corporation, when once created, might make, nor with the property which it might acquire.

Such is the purport of our language in *Tomlinson* v. *Jessup*, 15 Wall. 454, where we stated the object of the reservation to be "to prevent *a grant of corporate rights and privileges* in a form which will preclude legislative interference with their exercise, if the public interest should, at any time, require such interference;" and that

"The reservation affects the entire relation between the State and the corporation, and places under legislative control all rights, privileges, and immunities *derived, by its charter, directly from the State.*"

In *Railroad Company* v) *Maine*, 96 U. S. 499, where a law containing a similar reservation was under consideration, we expressed substantially the same thing; that by the reservation the State retains the power to alter the act of incorporation in all particulars constituting the grant to it of " *corporate rights, privileges, and immunities;* " and that " the existence of the corporation and its franchises and immunities, derived directly from the State," are thus kept under her control, adding, however, " that rights and interests acquired by the company, not constituting a part of the contract of incorporation, stand upon a different footing."

As thus seen, the reservation applies only to the contract of incorporation, to the corporate existence, franchises, and privileges granted by the State. With respect to everything else, it gives no power that the State would not have had without it. Necessarily it cannot apply to that which the State never possessed or created, and, therefore, could not grant. It leaves the corporation, its business and property, exactly where they would have been, had the Supreme Court held, in the Dartmouth College case, that charters are not contracts within the constitutional prohibition against legislative impairment. It accomplished nothing more; and any doctrine going beyond this would be subversive of the security by which the property of corporations is held, and in the end would destroy the security of all private rights. Behind the artificial body created by the legislature stand the corporators, natural persons, who have united their means to accomplish an object beyond their individual resources, and who are as much entitled, under the guaranties of the Constitution, to be secured in the possession and use of their property thus held as before they had associated themselves together. Whatever power the State may possess over corporations in their creation or in passing or amending the laws under which they are formed and altered, it cannot withdraw them from the guaranties of the Federal Constitution. As I said on another occasion:

" The State cannot impose the condition that the corporation shall not resort to the courts of law for the redress of injuries or

the protection of its property ; [or when in court, that it shall be subjected to different rules of evidence and be required to prove by two witnesses what individuals may establish by one ;] that it shall make no complaint if its goods are plundered and its premises invaded ; that it shall ask no indemnity if its lands be seized for public use, or be taken without due process of law, or that it shall submit without objection to unequal and oppressive burdens arbitrarily imposed upon it ; that, in other words, towards it and its property the State may exercise unlimited and irresponsible power. Whatever the State may do even with the creations of its own will, it must do in subordination to the inhibitions of the Federal Constitution. It, may confer by its general laws upon corporations certain capacities of doing business, and of having perpetual succession in its members. It may make its grant in these respects revocable at pleasure ; it may make it subject to modifications ; it may impose conditions upon its use, and reserve the right to change these at will. But whatever property the corporation acquires in the exercise of the capacities conferred, it holds under the same guarantees which protect the property of individuals from spoliation. It cannot be taken for public use without compensation ; it cannot be taken without due process of law ; nor can it be subjected to burdens different from those laid upon the property of individuals under like circumstances."

In *Detroit* v. *Howell Plank Road Company*, 43 Mich. 140, 147, the Supreme Court of Michigan, in considering this subject, uses similar language. Speaking by Mr. Justice Cooley, it said :

" But for the provision of the Constitution of the United States which forbids impairing the obligation of contracts, the power to amend and repeal corporate charters would be ample without being expressly reserved. The reservation of the right leaves the State where any sovereignty would be, if unrestrained by express constitutional limitations and with the powers it would then possess. It might, therefore, do what it would be admissible for any constitutional government to do when not thus restrained, but it could not do what would be inconsistent with constitutional principles. And it cannot be necessary at this day to enter upon a discussion in denial of the right of the government to take from

either individuals or corporations any property which they may rightfully have acquired. In the most arbitrary times such an act was recognized as pure tyranny, and it has been forbidden in England ever since *Magna Charta*, and in this country always. It is immaterial in what way the property was lawfully acquired, whether by labor in the ordinary vocations of life, by gift or descent, or by making profitable use of a franchise granted by the State; it is enough that it has become private property, and it is then protected by the 'law of the land.'"

Applying these views to the case before us it will be seen that the right asserted by the State, with respect to the property of the Spring Valley Water Company, cannot be upheld. The State gave to certain parties the right to form themselves into that corporation for the purpose of conveying pure and fresh water to the city and county of San Francisco. It did not grant to them the reservoirs by which that water is accumulated; it did not grant to them the aqueducts by which the water is carried to the city and county; it did not grant to them the pipes by which the water is distributed through the city; it only gave facilities for the conveyance of the water to the city and for its distribution. It could not, therefore, under its reserved power over the corporation, appropriate these reservoirs, aqueducts, and mains without making compensation for them; nor could it divert them, except upon like terms, from the purposes for which they were constructed, to the supplying of the city and county with salt instead of fresh water, or with gas or oil, or devote them to other uses.

The water itself is the property of the company. It was not taken from a running stream; nor from any lake; nor from any source where the government could assert that it alone had the right to control and use it. It was collected by the company as it descended from the heavens. Whatever may be the differences of opinion as to the ownership of running waters, or of waters of navigable streams, or of lakes, it has never been doubted that water collected by individual agency, from the roof of one's house, or in hogsheads, barrels, or reservoirs, as it descends from the clouds, is as much private property

as anything else that is reduced to possession, which otherwise would be lost to the uses of man. Indeed, it is a general principle of law, both natural and positive, that where a subject, animate or inanimate, which otherwise could not be brought under the control or use of man, is reduced to such control or use by individual labor a right of property in it is acquired by such labor. The wild bird in the air belongs to no one, but when the fowler brings it to the earth and takes it into his possession it is his property. He has reduced it to his control by his own labor, and the law of nature and the law of society recognize his exclusive right to it. The pearl at the bottom of the sea belongs to no one, but the diver who enters the waters and brings it to light has property in the gem. He has, by his own labor, reduced it to possession, and in all communities and by all law his right to it is recognized. So the trapper on the plains and the hunter in the north have a property in the furs they have gathered, though the animals from which they were taken roamed at large and belonged to no one. They have added by their labor to the uses of man an article promoting his comfort which, without that labor, would have been lost to him. They have a right, therefore, to the furs, and every court in christendom would maintain it. So when the fisherman drags by his net fish from the sea, he has a property in them, of which no one is permitted to despoil him. It was in conformity with this principle that this court, in *Atchison* v. *Peterson*, 20 Wall., 507, 512, in speaking of the general occupation of the public lands made free for mining, and the rights of the first appropriator of lands containing mines, said that

"He who first connects his own labor with property thus situated, and open to general exploration, does, in natural justice, acquire a better right to its use and enjoyment than others who have not given such labor. So the miners, on the public lands throughout the Pacific States and Territories, by their customs, usages, and regulations, everywhere recognize the inherent justice of this principle, and the principle itself was, at an early day, recognized by legislation and enforced by the courts of those States and Territories."

When the plaintiff brought water to the city of San Francisco, it had a right to sell the property at such reasonable prices as it could obtain, as it might have sold grain, or fruit, or coal, had it brought those articles to market. If the State could interfere and insist that such reasonable prices should be determined by other authority than the company, that authority must also have been other than that of the consumers or of their agents. Of the limitations upon the power of the State in this respect, independently of its contract, and for what compensation it can compel the company to sell its property, I shall hereafter speak. It is sufficient at present to say that the power reserved over the act of incorporation gave the State no control over such compensation which it did not possess without the reservation. Its control here is limited by the stipulations of the contract with the company. The legislature can, of course, repeal the act under which the plaintiff was incorporated, and thus put an end to its corporate existence, but so long as the corporation remains the contract remains with all its binding force.

The contract between the State and the corporators, by which the plaintiff became a corporation, is not to be confounded with the contract between the State and the corporation when created. Although the two contracts are contained in the same law, they are to be treated as separate and distinct from each other as if they were embraced in different statutes. Private corporations, by the Constitution of California, can be formed only under general laws; but all that is embraced by a general law of that character may not necessarily be a part of the contract of incorporation of parties forming themselves into a corporate body under it. It may refer to matters having no relation to corporate bodies, such as rules of evidence, forms of procedure, or descent of property; and it may contain contracts for specific work by the corporation created. No greater legislative control over such matters would result from their association in the same law which authorized the formation of the corporation, than if they were contained in separate acts. If, for example, the plaintiff had been incorporated to bring to the city and county of San Francisco, instead of water from its res-

ervoirs, granite from its quarries, and the act had provided that, having brought the granite, it should sell it to individuals at a designated price per cubic foot for paving the sidewalks, and to the city for the construction of a court room, or a public hall; would it be pretended that by virtue of its reserved power over the corporation the State could compel the sale and delivery of the granite at a different price? The natural and just answer would be that the contract with the corporation for the purchase of the granite is a different matter from the contract by which the corporators became a corporation; and would the answer be less just and perfect if the contract had stipulated that the price of the stone should be fixed by a commission of stone-cutters, or parties familiar with the value of the material? The different mode of reaching the price would work no change in the binding force of the contract.

Again, suppose that the plaintiff had been incorporated with power to loan money under an act requiring it to make a loan to the city at a specified rate of interest, and acting upon the authority, it had made a loan for years at such rate, could the State, by virtue of its reserved power over the corporation created, compel it to receive a less rate of interest than that stipulated, and make further loans at such reduced rates? The obvious answer to such a question would be that the contract authorized by the law was not the contract by which the lender became a corporation, and it is to the latter alone that the reserved power applies. Would it make any difference if the contract had stipulated that the interest should be annually fixed by the Secretary of the Treasury, or a commission appointed by him? The mode of reaching the rate of interest would not affect the binding character of the contract. The cases thus supposed in no respect differ in principle from the one before us. If the contract in this case cannot be upheld, the contracts in those could not be. Indeed, no contract between the State and a corporation created with the reservation mentioned could bind the State, though every term of obligation and every pledge of honor which language could express should be embodied in it.

It must be, that it is within the competence of the sovereign

power of a State to make a bargain which it cannot break. As observed by one of the distinguished counsel who argued this case, the very notion of the existence of a State—and it does not require a constitutional provision for that—is that, being a political body, it has a right to make a business arrangement with a particular party, corporate or personal, about a particular thing, which shall bind both. And in my judgment it is the plain duty of the court, when such an arrangement comes up for consideration, to assert its binding character and, so far as practicable, hold the parties to it.

I proceed to consider the position that the public of California had acquired such an interest in the water of the plaintiff as to authorize the State to fix the rates at which it shall be sold. The new Constitution declares in its fourteenth article that the use of all water appropriated for sale, rental, or distribution is a public use, and subject to the regulation and control of the State. I do not suppose that by this declaration the State intended to take possession of or assert an interest in all the water within its limits appropriated for sale, rental, or distribution, without regard to the rights of individuals who may have collected it in reservoirs, or stored it in other ways to enable them to dispose of it advantageously. A proceeding to enforce such a declaration would be open to constitutional objections against taking private property for public use without compensation to the owners. The object of the constitutional declaration, as I understand it, was to assert such a control by the State over the sale and distribution of water as to prevent it from being diverted by those who had appropriated, or might appropriate it, from the necessary uses of the public, or from being held at extravagant prices. To such a declaration no one can reasonably object, and if carried out with the observance of the rules which govern in other cases where private property is taken for public use, no legal obstacle can be raised to its enforcement.

The right to take private property for public use is inherent in all governments. It requires no constitutional declaration for its recognition; it appertains to sovereignty. The conditions upon which it shall be exercised are the only matters

requiring constitutional guarantees, and those conditions are that just compensation shall be made to the owner of the property, and that this compensation shall be ascertained by an impartial tribunal. A compliance with these conditions is essential, without which the taking of the property would be a mere exercise of arbitrary power not recognized as legitimate by any principles obtaining in the government of this country, State or federal.

When the use is public—and within certain limits, the State may determine that it is so—any property which the State may deem necessary for that use it may appropriate. The necessity or expediency of the appropriation is not a matter for judicial inquiry. The supplying of pure water to a city and its inhabitants is a matter of public concern. The taking of water held by private parties for that purpose is an appropriation of it for a public use; and the same conditions for its lawful appropriation must be followed as when property of a different character is thus taken. There must be the just compensation for it to the owner, and the impartial tribunal to appraise its value and determine the amount of the compensation. In *Gardner* v. *The Trustees of the Village of Newburg*, 2 Johns. Ch. 162, Chancellor Kent held that the owner of land over which a stream of water ran had a legal right to the use of the water, of which he could not be deprived against his consent without just compensation for it. A statute of New York had authorized the trustees of the village to supply its inhabitants with water, and the chancellor enjoined them from diverting for that purpose the water of a stream which ran through the plaintiff's land, because the statute had made no provision for compensation for it. What gives special significance to this decision, is the fact that the Constitution of New York at that time contained no provision, such as is found in all State Constitutions since adopted, against taking private property for public use without compensation. The chancellor showed that on general principles of justice recognized by all free governments, and by the writings of eminent jurists, such a provision for compensation is an indispensable attendant on the due and constitutional exercise of the power of depriving an individual of his property. And he said that

"A right to a stream of water is as sacred as right to the soil over which it flows. It is a part of the freehold of which no man can be disseized but by lawful judgment of his peers, or by due process of law."

If water cannot be taken by the State for public purposes from a stream running through the land of a private party without just compensation to him, surely the water collected in reservoirs on the lands of the plaintiff as it descends from the heavens cannot be taken for public uses without like compensation. The water thus collected, as already stated, is the property of the plaintiff, to which its title is as perfect as to the reservoirs and aqueducts which it has constructed. It is taken for public use; the use of the city and county, and of their inhabitants. If the plaintiff were dealing with the city or city and county alone, and were compelled to deliver its water at a prescribed price per gallon or hogshead, or according to some other mode of measurement, there could be no question that it would be a case of appropriating private property to public use. Is the character of the transaction at all changed because the water is to be delivered in part to the city and county, and in part to individual consumers, and that the latter are required to make compensation for what they take? There is the same appropriation of the property for public use in the one case as in the other, and it is for the protection of the owner, that he may not be despoiled of his property, that the constitutional guaranty was adopted. It matters not to whom the law may compel the delivery of the property, whether to one or many, if it is appropriated to public use. Water cannot be applied for the purposes required by the city and county or by their inhabitants, without being consumed. So that language employed with respect to regulating compensation for the use of articles of a durable character, such as vehicles, cars, and roads, is inappropriate and misleading when applied to water used for domestic purposes, or for sprinkling streets, extinguishing fires, flushing sewers, and irrigating parks. Regulating the price to be paid for the use of water in such cases is determining the compensation to be made to the

owner for transferring his title. The body of the water passes by its use from his ownership. In all such cases the great principle applies as when property of a durable character is appropriated for public use, that compensation, to be ascertained by an impartial tribunal, must be made to the owner.

As in *Pumpelly* v. *Green Bay Company*, 13 Wall. 166–177, in considering whether, in the execution by a public improvement authorized by law, a flooding by water of land so as to deprive its owner of its use was a taking of it in the sense of the Constitution so as to entitle him to compensation, this court said :

"It would be a very curious and unsatisfactory result if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public, it can destroy its value entirely—can inflict irreparable and permanent injury to any extent—can in effect subject it to total destruction without making any compensation, because in the narrowest sense of that word it is not taking it for the public use."

So I say it would be a very curious and unsatisfactory result if in construing this constitutional provision, designed to protect the property of the citizen against spoliation by the government, and to insure to him when taken for public uses just compensation, to be ascertained by an impartial tribunal, it should be held that when the owner is required to surrender the property taken in parcels to different parties and receive compensation as delivered to them, such compensation need be only such as the government in its discretion may think proper to prescribe. As stated in the Pumpelly case, it would make the constitutional provision an authority for the invasion of private rights under the pretext of the public good, which has no warrant in the laws and practice of our ancestors.

All the authorities lay down the doctrine that the property must be appraised and compensation therefor fixed by an impartial tribunal. It need not be a court of law; it may be composed of commissioners appointed for the special purpose. Whatever its form, its members must be free from interest and should be uninfluenced by prejudice, passion, or partisanship. And its proceedings must be conducted in some fair and just mode, either with or without a jury, as may be provided by law, with opportunity to the parties interested to present evidence as to the value of the property, and to be heard thereon. The legislature which determines the public purpose to be accomplished and designates the property to be taken, cannot act as such tribunal and fix the compensation, for that would be equivalent to allowing the legislature to take the property on its own terms.

" The proceeding " to assess the compensation, says Cooley, " is judicial in its character, and the party in interest is entitled to have an impartial tribunal and the usual rights and privileges which attend judicial investigations. It is not competent for the State to fix the compensation through the legislature, for this would make it the judge in its own cause." Constitutional Limitations, 704.

For the same reason a corporation which has the power to condemn cannot fix the compensation. It would thus become a purchaser at its own price, without regard to the estimate of others as to the value of the property taken. Nor can the corporation appoint the appraisers of the property, for they would, in that case, be its agents, and as such disqualified. Relationship to the parties whose property is to be appropriated, or interest in the property, would disqualify the members of the tribunal as it would jurors before a court.

An act of the legislature of Minnesota provided for taking certain property for public use, and appointed, without the consent of the owners, three persons as commissioners to determine the compensation to be made, without requiring any notice to the owners of the proceeding or providing that they might at any stage appear before the commissioners, and the

Supreme Court of the State held the law to be unconstitutional and void. . The Constitution of the State contained no express provision as to the mode by which the compensation to be paid should be determined, and the court said :

" While the legislature is the judge of the necessity or expediency of the exercise of the power of eminent domain, it is not the judge of the amount or justness of the compensation to be made when the power is exercised ; ". [and again :] ." While, therefore, the Constitution prescribes no proper mode in which the compensation shall be determined, it would seem to follow that as to the question of the amount of compensation, the owner of the land taken for public use has a right to require that an impartial tribunal be provided for its determination, and that the government is bound in such cases to provide such tribunal, before which both parties may meet and discuss their claims on equal terms. And such seems to be the tenor of the authorities upon this question. The act in question does not provide such a tribunal. The commissioners to determine the compensation are private citizens, appointed directly by the legislature, without the consent of the persons whose land is taken by the public. No notice of the proceedings before the commissioners is given ; the land owner is not authorized to appear at any stage of the proceedings to object to the commissioners ; to introduce any proof or allegation before them. The proceedings are entirely *ex parte.* It certainly cannot be said that this is a just or equitable mode to determine the compensation due to a citizen for property taken for public use." *Langford* v. *County Commissioners of Ramsey County*, 16 Minn. 375.

Objections are often made in the courts of law to the reports of commissioners of appraisement, upon application to set them aside, on the ground that the members have been improperly influenced by others, and have allowed their judgment to be warped by solicitations, or by prejudice or partisanship, and when such objections have been sustained by proper proofs the reports have been adjudged invalid.

If, in the light of these decisions, we turn to the board of supervisors of San Francisco, it would seem impossible for us

to hesitate in declaring that in no respect can it be deemed an impartial tribunal, however honest its members may personally be, to determine the compensation which the owners of the water delivered to the city and its inhabitants should receive. Interested as its members are, as consumers of the water, as agents of the city, also a large consumer, and elected by constituents, every one of whom is a daily consumer, it is wanting in every essential particular to render it, in a legal sense, an impartial tribunal. If, therefore, as I have attempted to show, and I think have shown, the water of the plaintiff is its property, and when it is taken under the law of the State for public use, the plaintiff is entitled to just compensation, that board is incompetent to act in determining what that compensation shall be. It is difficult to conceive of any tribunal more liable to be controlled by external influences against the interests of the company.

Upon the action of the supervisors with reference to all other matters, it has been found necessary, for the protection of the public, to impose numerous restrictions. Without them, improvident contracts on behalf of the city and county would be made, extravagant schemes of supposed improvement undertaken, and its treasury be depleted. And yet this body, which, without any imputation upon the personal integrity of its members, but out of regard to the common weakness of humanity, the community will not trust in other matters without guards against its improvidence, and which is exposed to every influence which can warp its judgment and pervert its action, is allowed almost unlimited control over the property of the plaintiff and the compensation to be paid for it, and respecting which the plaintiff is not permitted to be heard except as a matter of favor.

So in every aspect in which this case can be exhibited— whether we regard the contract contained in the act of 1858, or treat the compulsory delivery of the property as a taking of it for public use—there is no feature in the acts authorized by the new Constitution with respect to its property which does not violate the constitutional rights of the plaintiff. In the enforced sale of its property at prices to be fixed by the agents

of the consumers, the line is passed which separates regulation from spoliation.

For the reasons thus stated I cannot assent to the judgment of the court.