## TEXAS ELECTRIC SERVICE CO. v. CITY OF SEYMOUR et al.

### No. 270.

District Court, N. D. Texas, Wichita Falls Division.

Dec. 1, 1931.

Cantey, Hanger & McMahon, of Fort Worth, Tex., and Worsham, Rollins, Burford, Ryburn & Hincks, of Dallas, Tex., for complainant.

Touchstone, Wight, Gormley & Price, of Dallas, Tex., and J. A. Wheat, of Seymour, Tex., for respondents.

ATWELL, District Judge.

Seymour, Tex., has 2,626 people. It has about seven hundred consumers of electric current. There are two electric service companies. The complainant's plant is of the value of $170,000 plus, for useful and useable. property; the respondent's plant is worth approximately $130,000. The customers of the community are divided about equally between the two, with a slight preponderance in favor of the municipal plant. The predecessor of the complainant ran its business at a loss. The complainant enjoyed a profit of 2.69 per cent. without taking into account reserve for depreciation; if that is taken into account it ran at a loss for the twelve months ended July 31, 1931, of $4,631.46. If the complainant put into effect the rates fixed by the city council of Seymour, and retained all of its present customers, its return would have been, for the same period, 5.66 per cent., without taking into consideration a reserve for depreciation; if that were taken into consideration its per cent. of return would have been .3. The ordinance which the council passed under the authority of a general statute of the state of Texas vesting in towns having more than two thousand population the right to fix rates for such utilities required the

complainant to increase the charge that it was making to its patrons. Articles 1119, 1123, R. S. Tex. 1925.

■ Such action by the council was based on a right delegated by the state, and therefore such constitutional questions arise as give this court jurisdiction. Home Telephone & Telegraph Co. v. City of Los Angeles, 227 U. S. 278, 33 S. Ct. 312, 57 L. Ed. 510; City of Louisville v. Louisville Railway Co. (C. C. A.) 39 F.(2d) 822; Kentucky Power & Light Co. v. City of Maysville (D. C.) 36 F.(2d) 816; Portland Railway Company v. City of Portland (D. C.) 210 F. 667; City of Dayton v. City Railway (C. C. A.) 16 F.(2d) 401.

The facts may differentiate Palestine Telegraph Company v. City of Palestine (D. C.) 1 F.(2d) 349, but, if not, that case seems to be out of line with the weight of authority.

It is contended that the increase demanded by the ordinance would result in a further loss of business to the complainant; that, if the complainant's rates are the same as the municipal rates, complainant will lose many of its customers. The testimony indicates that a number of those who are at present patrons of it would cease to be such if and when the rates of the two plants are made equal. The fixing of a minimum rate would, almost certainly, result in such equality. Of the seventy questioned directly about this matter, approximately twenty-one say definitely that they would go over to the municipal plant if the rates were the same.

The testimony shows further that, during the campaign that was waged for the installation of what is called the municipal plant, there were many commitments. There was also some intemperate language used against the complainant. It also appears that the plant that is called the municipal plant, is, in truth, not such in fact, for it is asserted by several members of the city council that, if such plant does not succeed, it will go back to the seller. The testimony also discloses that the ordinance complained of was passed by the council because the city had been unable, out of the earnings of the new plant, to make the payments it had promised to make thereon, and that a refinancing was necessary; and in order to keep such new promises, as to payments, the ordinance was passed fixing a minimum rate which it was thought would result in the securing of more customers, which customers the complainant was then enjoying.

It is contended that this interest and activity by the city council disqualified it as a rate-making body. Cases which are cited are grounded on the general proposition that the same person should not be party and judge. There are no holdings directly in point, but the general thought that one should be free from any bias or interest when fixing the rights and obligations of others, runs through them all. Los Angeles Gas & Electric Co. v. City of Los Angeles (D. C.) 241 F. 912; Id., 251 U. S. 32, 40 S. Ct. 76, 64 L. Ed. 121; McQuillin on Municipal Corporations (Second Ed.) Vol. 2, § 629; Stroud v. Consumers' Water Co., 56 N. J. Law, 422, 28 A. 578; Woodward v. City of Wakefield, 236 Mich. 417, 210 N. W. 322; Tumey v. Ohio, 273 U. S. 510, 47 S. Ct. 437, 71 L. Ed. 749, 50 A. L. R. 1243; Spring Valley Water-Works v. Schottler, 110 U. S. 347, 4 S. Ct. 48, 28 L. Ed. 173; Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 17 S. Ct. 56, 41 L. Ed. 369; City of Austin v. Nalle, 85 Tex. 520, 22 S. W. 668, 960.

But we do not need any authority to support us in the conviction that one charged with the duty of making a rate must recognize the sacredness of the trust to deal fairly with the utility, so that it shall be able to exist and at the same moment scrutinize carefully the rights and needs of the people who are the customers of the utility. Whether we view the office as judicial or legislative, the holder should be above any consideration other than the solemnity of acting with exact justice. Those who composed the Seymour city council were unquestionably men of integrity, but they were men. They were of the opinion that competition was necessary. In the securing of such competition they were somewhat careless as to what should result to the utility that was already functioning. Their sole thought seemed to be for the success of the new plant. That its success might interfere seriously with the earnings of the private plant was inconsequential, provided such interference resulted in added revenue and customers for the new concern.

■ Monopoly and competition are words that may not be used loosely when vested property rights are concerned. Monopoly is not favored by the law, nor is competition welcomed if it is to be purchased by strangling that which is already living.

■ Ordinarily an increase of price means an increase of revenue, and an increase of revenue decreases the possibility of confisca-

tion; but, if two poorly paid and inadequately supported public utilities are functioning side by side, the one being a so-called municipal plant and the other being a privately owned institution, and if the testimony of the actual consumers shows that some of them, at least, are customers of the private institution because its rates are lower, and that they would cease to be such customers if its rates were made equal to the municipal plant, then and in that event if such equal rates are insufficient to pay an appropriate revenue, upon the property used and useful in the private plant, there is no escape from the conclusion that the fixing of such higher minimum rate would be, within the terms of the law, confiscatory. It is immaterial that the change from the one to the other would be affected by the local sentiment, or by a patriotic feeling; or by any other consideration, that might be termed political or social. The fact with which the court is concerned is, Would the change be made? If the customers would change, and thereby deplete the revenues, the showing is sufficient.

This has been pointed out in a number of cases, not the least remarkable of which is Great Northern Utilities Company v. Public Service Commission et al. (D. C.) 52 F.(2d) 802. It was a three judge court case growing out of the fixing of a rate by the Public Service Commission of state of Montana for one of the cities of that state. The court was composed of Circuit Judge Sawtelle, and District Judges Pray and Bourquin. The two district judges agreed that the minimum rate made by the commission should be enjoined. Judge Sawtelle withdrew to file a dissenting opinion, but, after a careful study, he supported, in a well-considered opinion, the correctness of this position.

Bearing in mind the fact that regulation means to foster, protect, and control the commerce, with appropriate regard to the welfare of those who are immediately concerned, as well as the public at large, and to promote its growth and insure its safety, and also bearing in mind that a public utility must not be permitted to drive out its competitors by the establishment of cut throat rates, we find that all of the guideposts may be observed by also keeping in mind that a utility is entitled to a fair return upon a fair value of its property.

The city began its campaign in the present case by promising to the people a lower rate than was then being charged by the serving company. When the new plant was established, that rate was put into effect. At once the established company lost approximately half of its customers, and it thereupon lowered its rate beneath that charged by the other concern; and then followed the effort of the city council, through the ordinance complained of, to require the complainant to increase its rate to that charged by the city plant. So we find that each side has engaged in what may be termed active competition. Neither may be said to have exceeded its lawful rights.

It seems that the equities are with the complainant, and that the defendant should be enjoined from putting into effect the ordinance complained of, or of visiting any of the criminal penalties of such ordinance upon the complainant.