# SUPREME COURT,
## STATE OF KANSAS.

## JANUARY TERM, 1906.

*PRESENT:*

Hon. WILLIAM A. JOHNSTON, Chief Justice.
Hon. ADRIAN L. GREENE,
Hon. ROUSSEAU A. BURCH,
Hon. HENRY F. MASON,
Hon. CLARK A. SMITH, } Justices.
Hon. SILAS W. PORTER,
Hon. CHARLES B. GRAVES,

---

J. M. RATCLIFF v. THE WICHITA UNION STOCK-YARDS COMPANY.

No. 14,421.   (86 Pac. 150.)

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW—*Business Affected with a Public Interest—Regulation of Charges.* The carrying on of stock-yards at a commercial center, with which all the railroads entering the city connect, and which is the only available market in the city and for a large scope of country around it for the selling, feeding, resting and shipping of live stock, is a business affected with a public interest, and is subject to public regulation and control in respect to rates.

2. —— *Rates Not Confiscatory.* The averments of an answer examined, and it is *held*, that they fail to show that the rates prescribed by chapter 487 of the Laws of 1903, defining public stock-yards and regulating the charges thereof, are so palpably unreasonable and unjust when applied to the defendant as to amount to the taking of private property without just compensation or due process of law.

3. —— *Legislative Powers—Limitation.* There are no limits

1—74 KAN.

upon the legislative power of the legislature of the state, except such as may be found in the state and federal constitutions.

4. ——— *Act Held Valid.* Chapter 487 of the Laws of 1903 held not to be repugnant to the provisions of the state constitution.

Error from Sedgwick district court; THOMAS C. WILSON, judge. Opinion filed June 9, 1906. Reversed.

### STATEMENT.

THIS is an action by J. M. Ratcliff to recover for overcharges on live stock placed in, and marketed at, the Wichita Union Stock-yards. He alleges that he is a raiser, dealer and shipper of live stock, operating in the vicinity of Wichita, and that defendant's stock-yards at Wichita are public, and the only ones within a radius of 200 miles of Wichita, no others being nearer to plaintiff's place of business than the Missouri river, which is about 260 miles away. He avers that between April and September, 1903, he shipped and placed in defendant's stock-yards 6125 hogs and 1100 cattle, which were delivered to and received by defendant for the purpose of being exposed to sale, and that for driving, yarding, watering and weighing these hogs and cattle the defendant charged and compelled plaintiff to pay eight cents per head for the hogs and twenty-five cents per head for the cattle, in violation of the provisions of chapter 487 of the Laws of 1903, which limit the charges for such services to six cents per head for hogs and fifteen cents per head for cattle. He further avers that he offered to pay the statutory rates; that the charges imposed by the defendant were paid under protest and compulsion; and that the amount of the excessive payment was $232.50, which the defendant refused, upon demand, to refund. The plaintiff asked judgment for this amount.

The defendant's answer admits the above-recited facts, and alleges that it is a corporation with a paid-up

capital stock of $600,000, holding no franchises from the state of Kansas or the city of Wichita; that it acquired sixty-eight acres of land at Wichita, Kan., and constructed thereon stock-yards, with all of the facilities for handling live stock promptly and safely, and that every railroad entering Wichita has connections with its yards; that in providing structures, fixtures and appliances in making the yards in every way complete large sums of money were necessarily expended; that great expense was incurred in the construction of separate pens, and in maintaining the yards so as to comply with the quarantine regulations of the United States and of the state of Kansas; that its yards have a capacity equal to receiving and handling 5000 hogs and 3000 cattle daily, with a complete water and feeding system, track and car scales for weighing, barns and warehouses for storing supplies, and with walks for the convenience of shippers, dealers and customers; that its officers and stockholders, as well as the company, have expended $250,000 in securing the location of packing-houses, which it is alleged are necessary to a live-stock market.

Defendant also avers that the growth of its business has been slow; that there has been active competition by yards at Denver, Pueblo, Fort Worth, Kansas City, St. Joseph, Omaha, Sioux City, St. Paul, St. Louis, and Chicago, and that it has made no profit over and above the cost of its operation since its business was established; that because of the competition, and of the fact that shippers may send their stock to any market, its business is uncertain; that while its investment is permanent, the expense of operation and maintenance is continuous, and is liable at any time to exceed the revenue derived from the business. It is averred that for all of the facilities provided the company charges the shipper twenty-five cents per head for cattle and eight cents per head for hogs, and these are the rates which are charged at all the yards above mentioned,

although such other yards operate at less expense and do not give better facilities.   It is then alleged:

"Defendant further avers that in addition to furnishing all the facilities and labor at its yards for shippers of live stock and their animals, as above set forth, it also advances the money therefor and "pays the freight charges on animals sold, guarantees its weights of the stock to be correct, and assumes great risks of injuries and damages thereto while in the custody of its employees, and all for the charges aforesaid; that defendant's charges are uniform to all shippers and are the customary charges at all other stockyards, and have been for many years; and that they are no more than a just, fair, and reasonable compensation for the facilities and labor furnished as aforesaid, and for the services rendered to live stock therefor as hereinbefore set forth, and they are only a reasonable exaction for such facilities, labor and services; and that any less charge therefor than twenty-five cents per head for cattle, and eight cents per head for hogs, would be, and is, an inadequate and insufficient compensation, and less than such facilities, labor and services are actually worth."

It further avers, as showing the reasonableness of its charges, that they are less than those made and collected by others for services in connection with handling live stock, and instances tending to substantiate this statement are given.   Then follow these averments:

"Defendant therefore avers that whether the intrinsic value and worth of the services rendered by it for its aforesaid charges are considered, or whether those charges are compared with the charges made for services rendered by others in connection with such live stock, or for services somewhat similar rendered to other animals, its aforesaid charges are reasonable and fair in themselves, no more than made for similar services at other yards, and are the usual and customary charges everywhere; and that any less charges will be inadequate and insufficient compensation for the facilities and service furnished and rendered, and would not afford defendant any compensation whatever for some of such facilities and services."

It is further alleged that if the rates provided for in the act of 1903 were in force it would infringe the natural rights of the company and its stockholders, and deprive them of their property without due process of law, and otherwise violate the provisions of the constitutions of the United States and of the state of Kansas.

To this answer a general demurrer was filed, which the court overruled. The plaintiff elected to stand upon the demurrer, and therefore final judgment was rendered for defendant. The plaintiff complains.

*L. M. Day*, for plaintiff in error.

*Houston & Brooks*, and *H. Whiteside*, for defendant in error.

The opinion of the court was delivered by

JOHNSTON, C. J.: The validity of chapter 487 of the Laws of 1903, relating to stock-yards, is the principal question raised by the pleadings and the decision of the trial court. That act declares and defines what shall constitute public stock-yards, the duties of those operating them, and prescribes maximum charges for the use of the yards and for the facilities and services furnished, viz.: For cattle fifteen cents per head, calves eight cents per head, hogs six cents per head, and sheep four cents per head. There is also contained in the act a regulation of the sale of dead animals, and it finally provides that a violation of its provisions shall be deemed a misdemeanor, the penalties prescribed being a fine of not more than $100 for the first conviction; for a second conviction a fine of not less than $100 nor more than $200; for a third conviction a fine of not less than $200 nor more than $500 and imprisonment in the county jail for not more than six months; and for each subsequent offense there is imposed a fine of not less than $1000 and imprisonment in the county jail not less than six months.

It is contended that the act, if enforced, would infringe the natural right of the defendant to make such contracts in respect to its business as it might choose to make, deprive it of property and compensation for property without due process of law, and violate the federal constitution, particularly the fifth, eighth and fourteenth amendments of that instrument; and, further, that it conflicts with sections 1, 9 and 20 of the bill of rights of the state constitution. (Gen. Stat. 1901, §§ 83, 91, 102.)

The first and main contention is that the Wichita stock-yards company is strictly a private corporation, engaged in a purely private business, with full liberty of contract, and is therefore not subject to legislative regulation and control. The state has conferred on the defendant the right to exist as a corporation and to exercise the chartered privileges which ordinarily go with incorporation, but no special franchises or rights have been conferred upon it by either the state or the city of Wichita.

As to corporations which are *quasi*-public in character and in behalf of which the power of eminent domain is exercised—those upon which special privileges have been conferred—there is no dispute. It is conceded by all that these are so far affected with a public interest as to be subject to reasonable regulation and control by the state. But is the enjoyment of special rights and powers conferred by the public the test as to whether a business is impressed with a public interest? Many kinds of business carried on without special franchises or privileges are treated as public in character, and have therefore been subjected to legislative regulation and control. The nature and extent of the business, the fact that it closely touches a great many people, and that it may afford opportunities for imposition and oppression, as in cases of monopoly and the like, are circumstances affecting property with a public interest. Police regulations of the business of dealing in patent-rights have been

maintained on the theory that it affords great opportunity for imposition and fraud. (*Mason v. McLeod,* 57 Kan. 105, 45 Pac. 76, 41 L. R. A. 548, 57 Am. St. Rep. 327; *Allen v. Riley,* 71 Kan. 378, 80 Pac. 952.)

Public necessity and the public welfare are the broad general grounds upon which the right of legislative control is based, rather than that a special·privilege has been conferred in consideration of which public control is conceded or required. In *Munn v. Illinois,* 94 U. S. 113, 24 L. Ed. 77, Chief Justice Waite, referring to the right to regulate business under the police power, said: "The government regulates the conduct of its citizens one toward another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good." (Page 125.) Upon these considerations the business of banking has been subjected to control, and the right to regulate the interest which may be charged for the use of money is now unquestioned. The police power is exercised in controlling the business of insurance, the operation of mills, hotels, theaters, wharves, markets, warehouses for the storage of grain and tobacco, common carriers, the collection and distribution of news, and the business of supplying and distributing water and gas. Some of these rest upon considerations of health, or the safety or the convenience of the people, but all fall within the general grounds of public necessity and public welfare. ·

In *La Harpe v. Gas Co.,* 69 Kan. 97, 76 Pac. 448, it was declared that "the production and distribution of natural gas for light, fuel and power affect the people generally to such an extent that the business may be regarded as one of a public nature, and is almost, if not quite, a public necessity, the control of which belongs to the state." (Page 100.) That business has the element of transportation, although it includes other elements which affect it with a public interest. The supreme court of the United States has also said, with reference to the regulation of a water company: "That

it is within the power of the government to regulate the prices at which water shall be sold by one who enjoys a virtual monopoly of the sale, we do not doubt." (*Spring Valley Water-works v. Schottler*, 110 U. S. 347, 354, 4 Sup. Ct. 48, 28 L. Ed. 173.)

Since the decision of the public-elevator cases by the supreme court of the United States there is little room for contention that the business of operating stockyards like those at the city of Wichita is not affected with a public interest, nor within the scope of legislative regulation.   In *Munn v. Illinois*, 94 U. S. 113, 24 L. Ed. 77, it was expressly decided that a warehouse-man who receives and stores grain for compensation is engaged in a business of a public nature; that the public has an interest in the use to which he devotes his property; and that for the public good he must submit to public control.   Although this decision met with a strong dissent and much protest, it has been affirmed and reaffirmed by the same court, and the principle upon which it rests has been recognized in a multitude of that court's decisions.   (*Budd v. New York*, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247; *Brass v. Stoeser*, 153 U. S. 391, 14 Sup. Ct. 857, 38 L. Ed. 757; *W. W. Cargill Co. v. Minnesota*, 180 U. S. 452, 21 Sup. Ct. 423, 45 L. Ed. 619; *Cotting v. Kansas City Stock-yards Co., &c.*, 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92.)   These decisions are conclusive authority upon the questions arising under the federal constitution, and following them it must be held that the stock-yards business, as conducted at Wichita, is impressed with a public interest, and therefore subject to reasonable statutory control.

The operation of stock-yards has more of the characteristics of a public business than the carrying on of an elevator or a warehouse.   It possesses the market features, including considerations of sanitation and health, and it also has more of the monopolistic features.   The stock-yards in question are situated in a commercial center, and constitute the public live-stock

Ratcliff v. Stock-yards Co.

market for a great region largely devoted to the live-stock business. The principal railroads of the southwest country enter Wichita and their tracks all unite in the stock-yards, and the business is therefore intimately related to the business of transportation. Here the stock-raisers and shippers meet and deal with the packers and purchasers, and here live stock in transit from Oklahoma, Texas and Colorado to more distant markets are unloaded for rest, feeding, and care. No other market exists nearer than Kansas City on the east, which is about 260 miles away, and the nearest ones on the west are Denver and Pueblo, about 500 miles away. Because of the nature of the business and the railroad facilities the establishment of other markets at or near Wichita is impracticable, and hence these stock-yards are, and of necessity will be, the only available place where the breeders, feeders and dealers of a great scope of country can conveniently market their live stock. The company has, therefore, a practical monopoly of a vast business, affecting thousands of people who are almost obliged to deal at that market and at the rates which the company may choose to charge. To the company is committed the feeding, watering and weighing of cattle sent from great distances, whether accompanied by the owner or not, and this is an additional reason for regulation and control.

In *Cotting v. Kansas City Stock-yards Co.*, 82 Fed. 850, it was held that "a stock-yard business, located in a large city, at the junction of many railroad lines, which furnishes the only proper facilities for the unloading, resting and feeding of live stock in transit, and for the sale of cattle within said city, is affected with a public use, so as to be subject to legislative control, and the proper legislative body may prescribe a maximum rate of compensation for the care and handling of stock thereat." (Syllabus.) This case was taken to the supreme court of the United States, where it was reversed because of a discriminatory provision of the statute under consideration. In determining

that question, however, Mr. Justice Brewer, who rendered the decision, in commenting on the nature of the business of stock-yards and the interest of the public in it, took occasion to say:

"Tested by the rule laid down in *Munn v. Illinois,* it may be conceded that the state has the power to make reasonable regulation of the charges for services rendered by the stock-yards company. Its stock-yards are situated in one of the gateways of commerce, and so located that they furnish important facilities to all seeking transportation of cattle. While not a common carrier, nor engaged in any distinctively public employment, it is doing a work in which the public has an interest, and, therefore, must be considered as subject to governmental regulation." (*Cotting v. Kansas City Stock-yards Co., &c.,* 183 U. S. 79, 85, 22 Sup. Ct. 30, 46 L. Ed. 92.)

In *Delaware, &c., R. R. Co. v. The Central Stock-yard Co.,* 45 N. J. Eq. 50, 17 Atl. 146, 6 L. R. A. 855, the court discussed the nature of the business, and held that the business of maintaining stock-yards corresponds with that of warehousemen, and therefore is subject to the same general principles of law. It was held, however, that in the absence of a statute a court of chancery could not impose regulations upon those engaged in the business without usurping legislative power.

In *Stock Exchange v. Board of Trade et al.,* 127 Ill. 153, 19 N. E. 855, 2 L. R. A. 411, 11 Am. St. Rep. 107, it was held that the market quotations and reports of the board of trade of Chicago had become affected with a public interest, and so long as it continued in business it must furnish reports and quotations to all who may desire them for lawful purposes, and upon the same terms. In a later case before the same court it was held that the Chicago Live Stock Exchange could not be treated as a public market in the ordinary sense, but in the course of the decision it was said that the character and magnitude of its business was such as "to warrant the legislature, in the exercise of its legis-

lative discretion, in declaring a public use, and placing said business under legal control and supervision, but such power, in our opinion, does not rest with the courts." (*Live Stock Commission Co. v. Live Stock Exch.*, 143 Ill. 210, 240, 32 N. E. 274, 18 L. R. A. 190, 36 Am. St. Rep. 385. See, also, *Head v. Amoskeag Manufacturing Company*, 113 U. S. 9, 5 Sup. Ct. 441, 28 L. Ed. 889; *State v. Edwards*, 86 Me. 102, 29 Atl. 947, 25 L. R. A. 504, 41 Am. St. Rep. 528; *Nash, &c., v. Page, &c.*, 80 Ky. 539, 44 Am. Rep. 490; *Davis v. The State*, 68 Ala. 58, 44 Am. Rep. 128; *Baker v. The State*, 54 Wis. 368, 12 N. W. 12; *Brechbill v. Randall et al.*, 102 Ind. 528, 1 N. E. 362, 52 Am. Rep. 695; *State, ex rel., v. Gas Co.*, 34 Ohio St. 572, 32 Am. Rep. 390; Freund, Police Power, § 373; Cooley's Const. Lim., 7th ed., 870; 1 Tied. State & Fed. Control, § 95.)

We conclude that the stock-yards business as conducted in Wichita is clothed with a public interest, and that the state in the exercise of its police power may, within constitutional limitations, subject it to regulation and control.

Having determined that it is competent for the legislature to regulate the business of maintaining stockyards, there is little left of this controversy. It is conceded that the power of prescribing maximum charges for the use of property, including the things and services furnished by the company, is not without limit. While the fixing of rates in such cases is a legislative function, the regulation must be reasonable, and so it has been held that those carrying on a business affected with a public interest cannot be required to give the use of their property or to perform services without reward, nor to suffer that which would amount to the taking of private property without just compensation or due process of law. It has been said that the court will grant relief against legislation fixing rates for a public-service corporation which are so unreasonable as practically to destroy the value of the property used in the business. (*St. L. & San Francisco Railway*

*v. Gill,* 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567.) In another case the court said:

"It is unnecessary to decide, and we do not wish to be understood as laying down as an absolute rule, that in every case a failure to produce some profit to those who have invested their money in the building of a road is conclusive that the tariff is unjust and unreasonable. And yet justice demands that every one should receive some compensation for the use of his money or property, if it be possible without prejudice to the rights of others." (*Reagan v. Farmers' Loan & Trust Co.,* 154 U. S. 362, 412, 14 Sup. Ct. 1047, 38 L. Ed. 1014.)

Again, it has been held that when the question arises it is the duty of the courts to take into consideration the interests of both the public and the owner of the property devoted to a public use, and determine whether the legislative rates as an entirety are so unjust as practically to destroy the value of the property for all the purposes for which it was acquired. (*Covington, &c., Turnpike Co. v. Sandford,* 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560.) It has been often declared that the basis for testing reasonableness of rates charged under legislative sanction must be the fair value of the property in use. (*Smyth v. Ames,* 169 U. S. 466, 546, 18 Sup. Ct. 418, 42 L. Ed. 819; *San Diego Land Company v. National City,* 174 U. S. 739, 757, 19 Sup. Ct. 804, 43 L. Ed. 1154; *Cotting v. Kansas City Stock-yards Co., &c.,* 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92.)

The extent to which the courts may interfere with rates established by the legislature is a subject upon which there is a diversity of opinion, and which has not been definitely settled by the supreme court of the United States. In one of the later cases it was said:

"But it should also be remembered that the judiciary ought not to interfere with the collection of rates established under legislative sanction unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation as under all the cir-

cumstances is just both to the owner and to the public; that is, judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use." (*San Diego Land Company v. National City*, 174 U. S. 739, 754, 19 Sup. Ct. 804, 43 L. Ed. 1154.)

In *Cotting v. Kansas City Stock-yards Co., &c.*, 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92, it was said:

"What shall be the test of reasonableness in those charges is absolutely undisclosed. As to parties engaged in performing a public service, while the power to regulate has been sustained, negatively the court has held that the legislature may not prescribe rates which, if enforced, would amount to a confiscation of property. But it has not held affirmatively that the legislature may enforce rates which stop only this side of confiscation and leave the property in the hands and under the care of the owners without any remuneration for its use. It has declared that the present value of the property is the basis by which the test of reasonableness is to be determined, although the actual cost is to be considered, and that the value of the services rendered to each individual is also to be considered. It has also ruled that the determination of the legislature is to be presumed to be just, and must be upheld unless it clearly appears to result in enforcing unreasonable and unjust rates." (Page 91.)

In this case it was suggested in the argument that the rates are such as to warrant judicial interference. The answer of the defendant, however, does not fairly raise the question, and the pleader appears to have carefully avoided the making of allegations which would bring the case within the rule of the federal decisions. It is averred that the charges imposed are the customary charges at other stock-yards; that they are no more than a just, fair and reasonable compensation for the facilities and labor furnished and for the services rendered; and that any less charges would be

inadequate and insufficient compensation and less than such facilities, labor and services are actually worth. In another paragraph the pleader states:

"Defendant therefore avers that whether the intrinsic value and worth of the services rendered by it for its aforesaid charges are considered, or whether those charges are compared with the charges made for services rendered by others in connection with such live stock, or for services somewhat similar rendered to other animals, its aforesaid charges are reasonable and fair in themselves, no more than made for similar services at other yards, and are the usual and customary charges everywhere; and that any less charges will be inadequate and insufficient compensation for the facilities and service furnished and rendered, and would not afford defendant any compensation whatever for some of such facilities and services."

But these averments fall short of alleging that the rates imposed by the legislature are so unreasonable and unjust as to amount to the taking of property without just compensation. It does not allege and show, as Mr. Justice Harlan remarked, "clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use." (*San Diego Land Company v. National City,* 174 U. S. 739, 754, 19 Sup. Ct. 804, 43 L. Ed. 1154.) The fact that the legislative rates for some services and facilities or for all services and facilities furnished are unreasonable is not enough. The rates prescribed by law, as well as those charged by defendant, are so much per animal handled, and this includes the use of the property devoted to the purpose as well as the services and facilities furnished. The question is, as was said in *Covington, &c., Turnpike Co. v. Sandford,* 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560, whether the legislative rates are, as an entirety, so unreasonable and unjust as to destroy the value of the property devoted to the public use, or to deprive the

Ratcliff v. Stock-yards Co.

owner of property without due process of law.  There is nothing in the answer to the effect that the statutory rates, taken as an entirety, will not yield some return, or a reasonable return, on the money invested or on the property devoted to the public use.  In one of the latest cases decided by the supreme court of the United States, in refusing to interfere with legislative rates prescribed by the Minnesota railroad and warehouse commission, it was said:

"It is sufficient, however, for the purpose of this case to say that the action of the commission in fixing the rate complained of as to this particular class of freight has not been shown to be so unjust or unreasonable as to amount to a taking of property without due process of law, and we therefore conclude · that the judgment of the supreme court must be affirmed." (*Minneapolis & St. Louis Rld. Co. v. Minnesota,* 186 U. S. 257, 268, 22 Sup. Ct. 900, 46 L. Ed. 1151.)

The statement that the company is only charging such rates as are customary in other stock-yards is certainly not the equivalent of allegations to the effect that a less charge would practically destroy the property and money employed in the business, or deprive the owner of it without due process of law.

How far the legislature may go in limiting compensation which corporations engaged in a business clothed with a public interest may charge before it may be regarded as the taking of property without just compensation or due process of law is an important question.  May the courts interfere if there is just some reward on the value of the property in use?  Or are the owners of the property entitled to a substantial reward—such returns as are ordinarily received on property devoted to a private use, or upon ordinary private investments?  Is the corporation entitled to the current rate of interest on the present value of the property devoted to the use?  Will less than that be a fair and reasonable return?  And if it is not reasonable, measured by the earnings on ordinary invest-

ments, does the enforcement of such rates amount to the taking of property without just compensation? Is there any distinction to be made between rates for public-service corporations and public stock-yards in respect to the scope of the legislative power? And if the owner devotes his property to a business in which the public has an interest does he not submit his business and the rates charged the public to the judgment of the legislature as to what is reasonable, so long as the rates are not confiscatory? These questions are so important that it would not become the court to express an opinion upon them until they are fairly raised in the record and it is found necessary to the determination of the rights of the parties.

The averments of the answer do not show that the act of the legislature regulating stock-yards violates any of the provisions of the federal constitution mentioned. Nor do we find anything substantial in the claim that the act conflicts with the state constitution, in that the power to pass the act is not expressly delegated to the legislature. In section 1 of article 2 of that instrument (Gen. Stat. 1901, § 119) the people expressly vested full legislative power in the house of representatives and senate. The legislature represents the people of the state, and there are no limits upon the power which that body may exercise, except such as may be found in the constitution itself, or in the federal constitution.

Nor do we see any merit in the contention that the penalties imposed in the act constitute cruel and unusual punishments, and are so excessive as to render it invalid.

The judgment is therefore reversed, and the cause remanded for further proceedings.

All the Justices concurring.