No. 27,050.

THE FARMERS COÖPERATIVE COMMISSION COMPANY and A. E. RANDLE, *Appellants*, v. THE WICHITA BOARD OF TRADE, *Appellee.*

SYLLABUS BY THE COURT.

1. EQUITY—*Unconscionable Conduct.* A corporation which seeks relief in a court of equity should not be denied such relief because it favored the passage by the legislature of the statute upon which it relies.

2. EXCHANGES—*Regulation—Public Interest—Wichita Board of Trade.* Under the pleadings and the evidence disclosed by the record, it is held that the Wichita Board of Trade is affected with the public interest.

3. STATUTE—*Validity.* Chapter 6, Laws 1925, held not to be invalid for any of the reasons urged against it.

Appeal from Sedgwick district court, division No. 4; ISAAC N. WILLIAMS, judge. Opinion filed June 12, 1926. Reversed.

*J. W. Davis,* of Greensburg, *Thomas C. Forbes,* of Eureka, *F. S. Jackson, James E. Smith,* both of Topeka, and *Manvel H. Davis,* of Kansas City, Mo., for the appellants.

*J. Graham Campbell, Ray Campbell,* both of Wichita, and *J. R. Beeching,* of Hutchinson, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is a suit by the Farmers Coöperative Commission Company to enjoin the Wichita Board of Trade from suspending plaintiff—or, more accurately, Mr. A. E. Randle, its representative—from doing business on the defendant board of trade. A restraining order was issued when the petition was filed. Defendant answered and moved to set aside the restraining order. Later a hearing was had upon plaintiff's motion for a temporary injunction and defendant's motion to set aside the restraining order. The parties stipulated that evidence might be introduced and the hearing should be regarded as a trial upon the merits. The facts were in part agreed upon, and plaintiff offered additional evidence. The court sustained a demurrer to plaintiff's evidence and rendered judgment for defendant. Plaintiff has appealed.

Plaintiff is organized under the coöperative corporation statute (R. S. 17-1501 *et seq.*), with its principal place of business at Hutchinson. Its business is to sell and deal in grain—principally wheat. It has fifty-seven members, or stockholders, situated mostly in the

Wichita trade territory. Each of these members is a local coöperative corporation, owning an elevator, selling and dealing in grain, most of which is raised by its members. Defendant is a corporation, conducting a board of trade at Wichita, furnishing facilities for the dealing in grain, principally wheat, by its members. Plaintiff alleged that it is, and has been for many years, a member of the defendant, owning a seat on defendant board of trade; that the same is a valuable property right entitling plaintiff to the facilities of defendant in selling and dealing in grain; that the business for which defendant is incorporated and is engaged is affected with a public interest; that to suspend plaintiff from membership in defendant, and to deny plaintiff its rights thereunder, would deny to plaintiff a valuable property right in contravention of the federal constitution, and in violation of chapter 6 of the Laws of 1925.

Defendant in its answer, among other things, alleged that it is not a corporation for profit, but is an association—

"To maintain a board of trade; to promote uniformity in the customs and usages of merchants; to inculcate principles of justice and equity in business; to facilitate the speedy adjustments of business disputes; to inspire confidence in the business methods and integrity of the parties thereto; to collect and disseminate valuable commercial and economic information; and generally, to secure to its members the benefits of coöperation in the furtherance of their legitimate pursuits, and to promote the general welfare of the grain and milling industries at Wichita."

That the government of defendant is vested in its officers and directors, in conformity to its constitution and by-laws; that it has ninety-seven members, individuals, representing themselves, firms, or corporations; that defendant does no grain business itself and has no tangible assets, its expenses being paid by assessments; that shares in defendant corporation entitling an owner to membership privileges are of the reasonable value of $600; that such value depends upon the character and reputation of defendant and its individual members in their business transactions; that it is necessary for its officers to be permitted to discipline members for infractions of by-laws; that defendant has under lease rooms in an office building at Wichita where members meet and display their samples and sell and buy grain and grain products. It is further alleged that Wichita is not a terminal market, and that defendant is not engaged in transactions commonly known as "futures"; that defendant is not a contract market, as defined by federal grain future act of 1922, and could not be so designated; that defendant has no con-

trol over the prices paid or received by members for grain or grain products; that defendant's members conduct a wholesale grain business, buy and sell in car lots, or a consignment business. Much of the grain purchased in Kansas is for shipment to points outside of the state, and such business is interstate in character, and it is specifically denied that the business is affected with the public interest.

It is further alleged that its by-laws provide certain rates of commission to be charged by its members on consignments sold by them, specifically prohibits rebates or refunds of commissions in any manner, and provides that the board of directors shall suspend any member found violating the by-laws. It is alleged that plaintiff obtained membership in defendant board of trade by changing its by-laws so as to conform to the by-laws of defendant; that after it became a member it again changed its by-laws so as to be in conflict with the by-laws of defendant, and avers that chapter 6 of the Laws of 1925, is invalid for various reasons, which will be later discussed.

In the stipulation as to facts it is agreed that in March, 1920, plaintiff's representative made application for membership in defendant board of trade, and plaintiff advised defendant that its by-laws then provided for the distribution of profits—first, by paying cash six per cent dividend on stock; second, by putting to reserve account all, or part, of net profits of nonmembers' business, as ordered by directors; and third, by prorating to members all the net profits the business furnished by them has created, according to the business furnished by each member. Defendant regarded this method of distribution of profits as being in violation of its by-laws prohibiting rebates or refunds of commissions, and denied plaintiff's application for admission to membership. In May, 1922, plaintiff's representative again applied to defendant for admission as a member, and then advised that its by-laws had been changed so as to provide for the distribution of profits—first, by paying a cash eight-per-cent dividend on stock, and second, by retaining all additional profits in its treasury as working capital. This method of disbursing profits was not regarded by defendant as objectionable, and plaintiff was admitted to membership in defendant board of trade. In 1925 the legislature (Laws 1925, ch. 6) enacted a statute relating to boards of trade which provided, among other things, that no board of trade shall refuse membership to a representative of any lawfully formed or conducted coöperative association, and that no

rule of a board of trade shall be construed to forbid the return of profits on any patronage basis by such coöperative association to *bona fide* members. Following the passage of this statute, and in May, 1925, plaintiff amended its by-laws for the distribution of profits—first, by paying an annual dividend of five per cent on its stock; second, by putting to reserve account all, or a part, of the net profits of nonmembers' business, as ordered by the directors; third, by prorating to members all the net profits the business furnished by them has created according to the business furnished by each member. Notwithstanding the passage of the statute above mentioned, defendant regarded this amended by-law, as providing for distribution of profits in violation of its by-laws against rebates, or refunds of commissions, and gave notice to plaintiff that its representative would be suspended.

The trial court concluded plaintiff was not entitled to equitable relief, for the reason that it had not come into court with "clean hands"; that it had, in effect, obtained its membership in defendant board of trade by amending its by-laws so as to conform to the by-laws of defendant; that thereafter it had recommended to the legislature the passage of the statute above mentioned, and thereafter changed its by-laws in a manner known to be objectionable to defendant; that the conduct of plaintiff in that particular was in the nature of a subterfuge which deprived it of relief in a court of equity. This position is not well taken. Laws are enacted to apply to persons, firms or corporations which come within their provisions, and courts should so interpret and enforce them. The fact that plaintiff amended its by-laws to conform to the statute under which it was created, and then found itself, with relation to defendant, within the provisions of a newly enacted statute, is no reason why the court should deny it relief. But, it is argued, plaintiff proposed the act (Laws 1925, ch. 6) to the legislature and urged its adoption; but this, if true, is no reason plaintiff should be denied relief. Most legislative acts are proposed by parties more or less interested in their enactment. The legislature determines the advisability of the proposed law, and when enacted it represents the legislative judgment and becomes the law of the state, and any party, whether in favor of or opposed to its passage, may avail himself of it if he is, or brings himself, within its provisions.

It may first be noted that defendant had no personal or financial objection to plaintiff, and has no criticism to make of the manner in

which plaintiff, or its representative, transacted business as a member of the defendant board of trade, either with the defendant itself, or with its members or others. The sole objection is that plaintiff sees fit to distribute its profits in a manner objectionable to defendant. One is tempted to inquire, What concern is it of defendant what plaintiff does with its profits, whether it retains them for additional working capital, or disburses them to its stockholders? And if it does disburse them to its stockholders, why should defendant be concerned with the basis of such disbursement, so long as it is satisfactory to plaintiff and its stockholders, and in conformity with the statute under which it was created? It may be doubted whether plaintiff's method of disbursing profits is correctly construed as a violation of defendant's by-laws against rebating or refunding commissions. Plaintiff's distribution of profits to its members is not made alone on commission business, nor is it any fixed portion of its commission business. The entire profit of plaintiff not added to its surplus is disbursed to its stockholders, a part of it upon the basis of the stock owned by each member, and a part in proportion to the business which such stockholder has furnished to, or done through, the plaintiff. That business may have been commission business, or it may have been sales of grain purchased from its members, or may have resulted from dealings with nonstockholders, or may, indeed, have been purchases from plaintiff by its members. It is true, if the member did a commission business with plaintiff, and there was any profit upon it which was not set aside to surplus, it would be distributed, together with other earnings of the plaintiff, not as a rebate or refund on commissions, but as a part of the net earnings of plaintiff. But as this point pertains to the form of defendant's by-laws, we shall not base our decision thereon.

While the court below did not specifically declare chapter 6 of the Laws of 1925 invalid, the effect of the ruling of the court is to declare it invalid, at least as applied to plaintiff in this case. Obviously this court will have to determine the validity of the statute before this case can be disposed of finally, and since it is inherent in the decision of the court below, and the parties have argued it, we will dispose of it. The statute is entitled, "An act relating to boards of trade," and reads:

"SECTION 1. That the term 'board of trade' means and includes any exchange or association, incorporated or not, of persons who are engaged in the business of buying or selling grain or receiving the same for sale on consignment.

Farmers Coöperative Commission Co. v. Wichita Board of Trade.

"Sec. 2. That all transactions in grain, including and involving the sale thereof for future delivery, as commonly conducted on boards of trade, and known as 'futures' are affected with a public interest.

"Sec. 3. That all boards of trade which have not been designated a contract market by the secretary of agriculture under the act of congress are hereby declared to be and are designated as 'a contract market' and affected with a public interest. ·

"Sec. 4. That no board of trade shall exclude from, or refuse membership therein, nor deny any of the privileges thereof to any duly authorized representative of any lawfully formed and conducted coöperative association of producers, having adequate financial responsibility, which is engaged in cash grain business if such coöperative association has complied with such terms and conditions as are, or may be, imposed lawfully on other members of such board: *Provided,* That no rule of a board of trade or contract market shall forbid or be construed to forbid the return on any patronage basis by such coöperative association to *bona fide* members, of moneys collected or made in excess of the expense of conducting the business of such association."

Defendant contended in the court below, and contends here, that the statute is invalid for various reasons:

First, it is argued that the business of defendant is not, in fact, affected with a public interest. It will be noted that the purpose of defendant, as expressed in its charter, is largely governmental. It seeks to regulate the dealing in grain at Wichita, in the interest of the public welfare, by promoting uniformity in customs and usages; inculcating principles of justice and equity; facilitating the speedy adjustments of business disputes; inspiring confidence in business methods and the integrity of the parties; and collecting and disseminating commercial and economic information. These purposes read much like the preamble to the constitution of our government. Defendant undertakes to accomplish these purposes by the adoption of by-laws, which are administered by its officers, who investigate complaints against members charged with the violations thereof, and who impose prescribed punishments in the nature of fines, or suspensions. Defendant does not sell or otherwise deal in grain or grain products; its sole function is regulatory, confining itself to the conduct of the grain business at Wichita, in the interest of the general welfare. The necessity for its existence is predicated, evidently, upon the theory that the ordinary rules of law and procedure, embodied in our state and national, legal and governmental system, are inadequate to achieve the highest degree of general welfare in the conduct of the grain business at Wichita, and that such general welfare can be and is promoted by the rules and procedure of

defendant supplementing those of our government. Perhaps this view is correct. But when an organization is created for the sole purpose of promoting the general welfare and supervising the con- duct of those engaged in an important industry, to the extent that it determines who shall engage in it, and which deprives persons who conduct their business honorably and in conformity to law of the right to engage therein, it would seem that it has chosen to clothe itself with a public interest. But, passing this thought, let us look to the actual business of defendant, to see in what way, if at all, it is affected or clothed with a public interest.

The evidence shows substantially the following: Defendant leases three or four floors of a large office building at Wichita. On one of these floors is a large room used by its members as a trading room. It is equipped with facilities for trading in grain, including tables and trays for display of samples. Grain consigned to members is sold only by sample on the floor of the trading room during trading hours. Defendant keeps a record of these sales. Defendant re- ceives, by telegraph and otherwise, market information of various kinds and from many sources, including the market from the Kansas City and Chicago boards of trade, and sometimes from Winnipeg, Liverpool and other places, which it displays on a large blackboard in the trading room. All the market information it receives is avail- able to its members, and it distributes this information, and such sales on its trading floor as it records, to the general public by vari- ous methods. Other rooms, under its lease, are subleased to its members for office rooms. A person who is not a member of de- fendant is not permitted to trade in grain on its trading floor, nor to lease an office room in the building. Three of its office rooms are leased by defendant to members who conduct what is known as "wire houses," from which orders for the purchase or sale of grain, known as "options" or "futures" are transmitted to Kansas City, Chicago and elsewhere. Defendant has no connection with these "wire houses," except that it leases rooms to members who conduct them. Defendant does not conduct a "pit" market in "options" or "futures," such as is conducted at the Kansas City and Chicago boards of trade, and has no rules governing such deals. Defendant's business is a miniature of that conducted by the Board of Trade at Chicago, except as to the "pit" market in "options" or "futures." Its members do buy from, and sell to, each other, and frequently buy

or sell to nonmembers, grain for future delivery, either on the trading floor or elsewhere, but these deals usually contemplate the actual delivery of the grain. Defendant keeps no records of these deals. While other grains, and grain products, are dealt in, wheat is the principal one. Defendant has the only general grain market at Wichita—it is practically impossible for one to conduct a general grain business at Wichita without being a member of defendant. There is produced in Kansas from 90 to 180 million bushels of hard winter wheat each year. Approximately thirty to forty per cent of this is handled on the Wichita Board of Trade, or by its members. The conduct of the grain business, as regulated by defendant, and the market information distributed by it, materially affect the price of wheat in Kansas. The evidence discloses but one other board of trade in the state—that at Hutchinson—although there may be others. Judged by the rules stated in the decided cases (*Munn v. Illinois,* 94 U. S. 113; *Stock Exchange v. Board of Trade et al.,* 127 Ill. 153; *House v. Mayes,* 219 U. S. 270; *Brass v. Stoeser,* 153 U. S. 391; *Stafford v. Wallace,* 258 U. S. 495; *Grisim v. South St. Paul Live Stock Exchange,* 152 Minn. 271; *Chicago Board of Trade v. Olsen,* 262 U. S. 1; *Ratcliff v. Stockyards Co.,* 74 Kan. 1, 86 Pac. 150; *State v. Aikins,* 83 Kan. 792, 112 Pac. 605), we think it clear that the business of defendant is clothed with a public interest.

Defendant argues that although it should be determined the business of defendant is affected with the public interest, and therefore subject to reasonable regulation, such regulation must be of a general nature and of interest to the public; that the public can have no concern in the question whether a particular corporation, such as plaintiff, or coöperative corporations generally, should have a representative on the board of trade. Plaintiff has fifty-seven stockholders or members, each being a local coöperative grain company. It transacted business to the amount of about one and one-half million dollars on the Wichita Board of Trade during the year preceding the bringing of this action. The legislature evidently deemed it helpful in the preservation of the vital functions which a board of trade exercises over transactions in grain that producers and shippers should be given an opportunity to take part in the transactions in the market on the board of trade through a chosen representative. A similar objection was made to the federal statute

in *Chicago Board of Trade v. Olsen,* 262 U. S. 1, where, after discussing the question, it was said: "We think the objection to this feature of the act untenable."

It is argued that the act is void because of uncertainty and ambiguity, that the meaning of the terms used can be determined only by reference to the federal grain futures act, and that when such reference is made, they become unintelligible. We do not so construe them. It is clear that what the legislature had in mind was to restrict the application of the act to boards of trade within this state which have not been designated as "contract markets" by the secretary of agriculture under the act of congress, and which could not be so designated under that act. As so construed, the field covered by the act does not encroach upon that covered by the federal statute, and there is no uncertainty in its meaning.

Defendant objects to the act for other reasons, predicated upon the theory that its business is not affected with a public interest. Since we have decided against defendant's contentions on this point, these objections need not be further noticed. Defendant argues that the statute is void as an unlawful interference with interstate commerce. It is urged that much of the business transacted by members of the board of trade is the purchase of wheat for shipment to points outside of the state and even to foreign countries. The real question is whether the interstate character of the business of the individual members of defendant is material to the purposes of defendant, or only incidental thereto. The declared purposes of the defendant board of trade, as previously set out, are to regulate, promote, etc., the dealing in grain "at Wichita." Defendant is a Kansas corporation, located and doing business in Kansas, necessarily subject to the laws of the state. Its avowed purposes are local, pertaining to the dealing in grain at Wichita. So far as the defendant corporation is concerned, the fact that some of its members may do in part an interstate business is incidental to its purposes and not especially material thereto. The activities of defendant are not influenced in the least by the question whether grain purchased by its members is consumed locally or shipped out of the state. Similar questions raised in other cases have been decided in accordance with the views here expressed. (*Broadnax v. Missouri,* 219 U. S. 285; *Savage v. Jones,* 225 U. S. 501; *Merchants Exchange v. Missouri,* 248 U. S. 365; and cases heretofore cited.)

Defendant contends the act violates the provisions of our state

constitution. (Art. 2, § 17; art. 12, § 1.) The act is general both as it applies to boards of trade and to coöperative corporations.

Having considered all the objections urged to the validity of chapter 6, Laws 1925, we find nothing in any of them which requires us to hold it to be invalid.

The judgment of the court below will be reversed, with directions to enter judgment for the plaintiff.

HOPKINS, J. (dissenting).

BURCH, J. (dissenting): After considering the statute entitled "An act relating to boards of trade," I have concluded the legislative mountain labored and brought forth a mouse—a petty, special act, the entire subject of which is embraced in the proviso of section 4.

A group of business men at Wichita, engaged *bona fide* in grain trade, formed an association for the primary purpose of providing themselves with adequate facilities for the conduct of their business, just as city bar associations and medical societies organize to maintain libraries and equipment possible only by coöperation. They were guided by experience, adopted the form of board-of-trade organization, called their association a board of trade, and became a board of trade. By copying the federal statute, the legislature correctly defined such an association as a board of trade (section 1).

Section 2 declares that transactions in grain, including and involving sale for future delivery as commonly conducted on boards of trade, are affected with a public interest, but nothing was done about it. The Wichita Board of Trade, against which the act was leveled, does not deal in futures; if dealing in futures is a matter of public interest, the legislative effort was spent in proclaiming the fact; and nothing could be done about it because the subject of grain futures has been taken over by congress.

Section 3 takes up board-of-trade regulation where congress left off, and makes boards of trade not under federal regulation contract markets affected with a public interest, but nothing was done about it. The contracts, the markets, the whole subject of purchase and sale of grain, whether for cash or future delivery, are just as unregulated as before.

The result is, section 2, parading the subject of "futures," and section 3, protuberant with the borrowed term "contract market," are livery in which section 4 is dressed.

Section 4, down to the proviso, requires boards of trade to seat representatives of coöperative associations, and was functionless when the statute was enacted. The plaintiff had a seat on the Wichita Board of Trade, and no representative of any other association was crashing the gate of any board of trade.

The result is, the statute neither accomplished nor was intended to accomplish anything except the result contemplated by the proviso, and the title of the act should have been, "An act granting to one member of the Wichita Board of Trade the privilege of rebating commissions, contrary to the rules of the board."

Section 4 was virtually copied from the grain futures act of congress of September 21, 1922. What was the basis of public interest which furnished the constitutional foundation for that act? The answer to this question is found in section 3 of the federal law:

"Transactions in grain involving the sale thereof for future delivery as commonly conducted on boards of trade and known as 'futures' are affected with a national public interest; that such transactions are carried on in large volume by the public generally and by persons engaged in the business of buying and selling grain and the products and by-products thereof in interstate commerce; that the prices involved in such transactions are generally quoted and disseminated throughout the United States and in foreign countries as a basis for determining the prices to the producer and the consumer of grain and the products and by-products thereof and to facilitate the movements thereof in interstate commerce; that such transactions are utilized by shippers, dealers, millers, and others engaged in handling grain and the products and by-products thereof in interstate commerce as a means of hedging themselves against possible loss through fluctuations in price; that the transactions and prices of grain on such boards of trade are susceptible to speculation, manipulation, and control, and sudden or unreasonable fluctuations in the prices thereof frequently occur as a result of such speculation, manipulation, or control, which are detrimental to the producer or the consumer and the persons handling grain and products and by-products thereof in interstate commerce, and that such fluctuations in prices are an obstruction to and a burden upon interstate commerce in grain and the products and by-products thereof and render regulation imperative for the protection of such commerce and the national public interest therein." (42 U. S. Stat. 999.)

The act then provided that trading in futures may be conducted in contract markets only, designated by the secretary of agriculture and located at terminal points where cash grain is dealt in in such volume as to reflect the general value of grain. Dealing in grain according to the methods and practices of the Wichita Board of Trade were not regulated because they are not affected with a public interest.

The trading room, the blackboard, the trays in which the samples of wheat consigned for sale are displayed, the office arrangements, and the acquisition and dissemination of information, of the Wichita Board of Trade, are merely common equipment for common convenience of members. They are not regulated. There is no monopoly of or restriction upon the purchase, sale, delivery or transportation of grain, no manipulation or control of grain prices, and the statute does not pretend to regulate any of those matters. Those subjects are covered by the antitrust statute, which does not depend on indiscriminate use of the "affected with a public interest" branding iron. There is no complaint that commission charges are unfair or oppressive, or register deleterious effect on the grain market, and commission charges are not regulated. The result is, transactions in grain as they are conducted between the members of the Wichita Board of Trade, are barren of any public interest whatever, in the constitutional sense. The elevator cases and the stockyards cases involving the movement of property in the channels of commerce, have no application. The grain futures cases have no application, and the legislative declaration of a public interest is *brutum fulmen*. If, however, boards of trade were affected with a public interest, entrance of congress into the field of regulation excludes trespass by the state legislatures.

Rebates are demoralizing to any kind of public service, transportation, insurance, elevator charges, or other business affected with a public interest, and to the quasi-public service rendered by business dependent on public patronage. The sole effect of the statute is to compel an organized group of men engaged in buying and selling wheat on commission to suffer one member of the group to exercise a privilege which is detrimental to the associate relation and welfare. Since the matter does not affect the grain trade in any of its aspects, which is the only subject in which the public is concerned, and which the act distinctly does not regulate, the statute is a special private act, and not a public law, and is void.