THE STATE OF NEW JERSEY, RESPONDENT, v. THE CITY
OF TRENTON, APPELLANT.

THE STATE OF NEW JERSEY, RESPONDENT, v. THE CITY
OF NEWARK, APPELLANT.

Argued November 25, 1921—Decided March 6, 1922.

1. Under various legislative grants, certain cities of this state had
   been obtaining their water supply from public waters, when the
   legislature, by act of June 17th, 1907 (*Pamph. L., p.* 633). im-
   posed a license fee upon municipalities for their future use of
   waters, but only for such use in excess of present use, and also
   in excess of one hundred gallons daily *per capita. Held,* that the
   act imposing such license fee did not work a deprivation of an
   existing contractual or property right.

2. The state may exert its police power for the purpose of con-
   serving the public property, for the commonwealth, as was done
   by the act of 1907, imposing a license fee for the future use of
   waters. *Pamph. L., p.* 633.

On appeal from the Supreme Court.

For the state, *Thomas F. McCran,* attorney-general, and
*William Newcorn,* assistant attorney-general.

For the city of Trenton, *Charles E. Bird.*

For the city of Newark, *Jerome T. Congleton* and *Joseph
G. Wolber.*

*Robert H. McCarter,* of counsel for defendants.

The opinion of the court was delivered by

MINTURN, J.   For many years the cities of Trenton and
Newark had been obtaining their water supply from the
Delaware and Pequannock watersheds, respectively, under
various legislative grants for that purpose.

An act, general in its scope, designed by the legislature for

that specific purpose, and evidencing a liberal legislative public policy, was passed in 1888, entitled "An act to authorize any of the municipal corporations of this state to contract for a supply, or a further or other supply of water therefor." *Pamph. L.* 1888, *p.* 366.

In that situation the legislature passed chapter 252 of the laws of 1907, entitled "An act to establish a water supply commission, and to define its powers and duties, and the conditions under which waters of this state may be diverted." *Pamph. L., p.* 633. These two enactments serve to mark the parting of the ways between the legislative conception of the old order and the new; between a public policy which left the appropriation of the public domain to the haphazard necessities of sporadic local interests and a state-wide policy of conservation and distribution.

Under the provisions of the act of 1907, a commission was appointed by the governor, charged with supervision over all the sources of potable and public water supply, "to the end that the same may be economically and prudently developed for the use of the people of the state."

In furtherance of that general policy, the second section of the act inhibits any municipal corporation or others engaged in purveying water or "proposing to supply the inhabitants of any municipal corporation with water," from condemning lands or water, "for any new or additional source of water supply, or to divert water from such new or additional source, until such municipal corporation or person has first submitted descriptions thereof, which may be accompanied by maps and plans to said commission, and until said commission shall have approved the same."

To this legislative mandate is superadded a proviso that the act shall not affect water works already in process of construction, provided the plans of construction be submitted within ninety days after the approval of the act; and the section concludes with this significant provision: "Nothing in this act contained shall be construed to take from any municipality in this state the right to use and take all the water

which it has the right to use or appropriate by purchase or condemnation."

This provision, of course, must be read in conjunction with the other provisions, as well as the title of the act, which evince a general legislative policy of imposing a license fee for the use of water *in futuro;* of conserving its use and of dealing with "*new* or *additional* sources of water supply" upon a regulative basis.

In consonance with this general legislative conception, the eighth section of the act provides: "Every municipality, corporation or private person, now diverting the waters of streams or lakes with outlets, for the purpose of a public water supply, shall make annual payments on the first day of May, to the state treasurer, for all such water hereafter diverted in excess of the amount now being legally diverted; provided, however, no payment shall be required until such legal diversion shall exceed a total amount equal to one hundred gallons daily *per capita,* for each inhabitant of the municipality or municipalities supplied, as shown by the census of 1905. Such payment shall be deemed to be a license and its amount shall be fixed by said commission at a rate of not less than one dollar or more than ten dollars per million gallons." In default of payment of the fee to the state treasurer, of the aggregate amounts collectible, the state comptroller is directed to collect the same; and in case of failure to collect, he is directed to certify the amounts due to the attorney-general for collection, who is thereby authorized "to take immediate steps to collect the same in the name of the state." Such departmental action having been taken in the cases of these two municipalities, the attorney-general instituted the necessary actions in the Supreme Court and obtained judgments thereon.

The city of Trenton interposed three distinct defences, and the city of Newark interposed but one, the substance of which was a denial of the state's power to exact the fee. On motion, these defences were struck out, following the determination of this court in *State* v. *Jersey City,* 94 *N. J. L.* 431; 111 *Atl. Rep.* 544, upon the ground that the answers con-

tained no legal defence to the actions. From that judicial action this appeal has been taken.

The facts are not in dispute. It is conceded that the city of Trenton, at the time of the enactment of the act of 1907, was taking from the Delaware river daily fourteen million two hundred thousand gallons of water for local use, and that the city of Newark was daily extracting from the Pequannock river thirty-six million two hundred and forty-one thousand six hundred and sixty-six gallons for local use.

These diversions represent the ante-statutory flowage, and are considered by the state under the eighth section of the act of 1907 to be non-taxable. No dispute exists as to the *quantum* of water extracted, or as to the amount due therefor, if the essential proposition involving the legal right of the state to impose the license fee be legally vindicated.

The defendants, in effect, deny the power of the state to interfere with their present contractual status, as an interference with vested rights acquired by them as proprietary owners, and not as political subdivisions of the state. Thus their brief declares: "It is difficult to comprehend how in view of the foregoing cases it can be claimed that the state has not to the extent here claimed denuded itself of any right in, or dominion over, the waters, which are the subject-matter of these suits;" and, again, "any diminution of the right conveyed is a taking thereof in derogation of the grant, and to that extent the act of 1907 is unconstitutional."

This contention presents a misconception, as in no sense does the act in question contemplate a deprivation of an existing contractual or property right, but, on the contrary, it expressly assumes the right of these defendants to extract water from their respective sources of supply and imposes no tax thereon. It also assumes their right to continue to extract water from such sources as the demands of their populations and local exigencies may require.

The effect of this legislative policy, therefore, is, that nothing is taken from them in the way of property right or freedom of future action, in the execution of the powers conferred upon them.

Such, in effect, was the construction put upon the act by Mr. Justice Bergen, speaking for the Supreme Court, in *East Jersey Water Co. v. Board of Conservation, &c., 91 N. J. L. 448.*

The legislature assumed the right of the defendants to extract water free of a license fee, upon a basis practically of present consumption; and thereafter, and beyond that limitation, it placed them and all future purveyors of water upon the same basis by the requirement of a license fee. This situation simply presents the inquiry whether the state may exert its police power for the purpose of conserving the public property, in the interest of the common weal; for, as was remarked by Mr. Justice Pitney, speaking for this court in *McCarter, Attorney-General, v. Hudson County Water Co., 70 N. J. Eq. 695,* and, substantially, repeated by Mr. Justice Holmes, in the same case in 209 *U. S.* 349: "The regulation of the use and disposal of such waters, therefore, if it be within the powers of the state, is among the most important objects of government." Such was the legislative purpose, as we conceive it, in the provisions of the act of 1907—a regulation of the use, by the interpretation of the police power, in the interest of conservation and development. The fact that in the exercise of this power, men and corporations may be hampered and inconvenienced in the use or employment of their properties, presents no legal or constitutional barrier to its enforcement. *Slaughter House Cases,* 16 *Wall. (U. S.)* 36; *Mugler* v. *Kansas,* 123 *U. S.* 623; *Reetz* v. *Michigan,* 188 *Id.* 505; *California Co.* v. *Reduction Co.,* 199 *Id.* 306.

As was declared by Mr. Justice Magie, speaking for the Supreme Court in *State* v. *Wheeler,* 44 *N. J. L.* 91, in a case involving the construction of an act, designed to protect the waters, creeks and ponds of the state from pollution: "The design of the act is not to take property for public use, nor does it do so within the meaning of the constitution. It is intended to restrain and regulate the use of private property, so as to protect the common right of all the citizens of the state. Such acts are plainly within the police power of the legislature, which power is the mere application to the whole

community of the maxim, *Sic utere tuo ut alienum non lædas.* Nor does such a restraint, although it may interfere with the profitable use of property by its owner, make it an appropriation to a public use so as to entitle him to compensation," citing *Com.* v. *Alger,* 7 *Cush.* (*Mass.*) 53; *Com.* v. *Tewksbury,* 11 *Metc.* (*Mass.*) 55.

But the logical, and, as it seems to us, conclusive, answer to the defendants' contention, is that they are not only subsidiary political divisions of the state, exercising their delegated powers, presumably and exclusively in the public interest, but *ex necessitate* their business and property are thereby expressly affected with a public interest; and, under well-settled rules of law, become thereby subject to the exercise of the police power when exerted by the state in behalf of the general body politic. This doctrine was promulgated by the United States Supreme Court, in 1876, in *Munn* v. *Illinois,* 94 *U. S.* 113, and it has been consistently and repeatedly followed in subsequent adjudications in that court and in the states generally, until the principle has now been placed beyond the pale of controversy.

The principle there laid down was that "property does become clothed with a public interest, when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created."

Mr. Justice Bradley reiterated this view in a dissenting opinion in the *Sinking Fund Cases,* 99 *U. S.* 780, wherein he observed: "When an employment or business becomes a practical monopoly to which the citizen is compelled to resort, and by means of which a tribute can be exacted from the community, it is subject to regulation by the legislative power." To the same effect are: *Budd* v. *New York,* 143 *Id.* 517; *Brass* v. *Stoeser,* 153 *Id.* 391; *Colling* v. *Kansas City,* 183 *Id.* 79; *Cooley Const. Lim.* 734.

The principle has been applied to companies supplying water and gas. *Spring Valley Water Works* v. *Schottler,* 110 *U. S.* 347; *San Diego Land Co.* v. *National City,* 174 *Id.* 739; *Mobile* v. *Bienville Water Co.,* 130 *Ala.* 379.

Many of these adjudications have extended the exercise of the police power to the regulation of rates and charges for water consumed, as in the Granger cases. *Chicago, &c., Railroad* v. *Iowa,* 94 *U. S.* 155.

Subsequent adjudications have modified the exclusive and uncontrolled power of the legislature in that regard to the extent of declaring that the rates fixed by legislation must be reasonable, and to that end must be subject to judicial review. *Railroad Commission Cases,* 116 *U. S.* 307; *Smith* v. *Ames,* 169 *Id.* 466.

Under the general power of regulation in the public interest, existing public and *quasi*-public corporations, like foreign and domestic insurance and warehouse companies, and miscellaneous corporations of a *quasi*-public character, have been subjected by legislation to the payment of license fees and general regulatory requirements. *Cargill* v. *Minnesota,* 180 *U. S.* 452; *Carroll* v. *Greenwich Insurance Co.,* 199 *Id.* 401; *Fidelity Association* v. *Mettler,* 185 *Id.* 308.

The summation of the doctrine is contained in the statement that "the state under its power to enact laws for the general welfare of its people, may pass laws designed to increase the industries of the state, develop its resources and add to its wealth; for instance, laws forbidding any waste of natural gas or water which would be detrimental to the public as distinguished from an injury to an individual." 6 *R. C. L.* 212, and cases cited; *Smith* v. *Texas,* 233 *U. S.* 630.

A practical application of this principle is notably evinced in *People* v. *Beakes Dairy Co.,* 222 *N. Y.* 416, where it is declared that "the state may to some extent compel honesty, by imposing a license fee, if wide-spread frauds upon and losses are thereby prevented. Any trade, calling or occupation may be reasonably regulated if the general nature of the

business is such, that unless regulated many persons may be exposed to misfortune against which the legislature can properly protect them."

As the possession of the greater includes the lesser power, *a fortiori,* the power to regulate charges, rates and general conditions must also carry the power to license for the prosecution of business *in futuro* by a public agency, performing a public function as the delegated agent or arm of the state.

It is unnecessary, therefore, to determine for the purposes of this case the extent to which the state may exert its power in the general public interest, as between what the defendants allege to be the private or property rights of the municipalities and their political characteristics. It is enough for present purposes to affirm the right of the state to regulate in the public interest, the use of an indispensable natural commodity, committed by society to its care, development and conservation, by the imposition of a reasonable regulatory fee for the use only *in futuro,* by the body politic or public agency, whose unrestricted operation may result in segregating for local use entirely, the common property of the people. Such a regulation is in no legal sense a taking of private property, or a violation of any contractual right, but rather a regulation of the use of a common commodity by local public agencies in the general interest of the entire community.

These views lead to an affirmance of the judgment.

*For affirmance* — THE CHANCELLOR, CHIEF JUSTICE, SWAYZE, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, WILLIAMS, GARDNER, ACKERSON, VAN BUSKIRK, JJ. 15.

*For reversal*—None.